**Lisa WHITAKER, Plaintiff,**

v.

**MERCER COUNTY, Louis Soto, Patrick F. McManimon, Mamie Sapp, Mercer County Detention Center, et al., Defendants.**

**No. CIV. 97–3813(GEB).**

United States District Court,
D. New Jersey.

Aug. 23, 1999.

Christine Carey Lilóre, Mark Mulick, Paterson, NJ, for Plaintiff Lisa Whitaker.

Andrew J. Schragger, Office of Mercer County Counsel, Trenton, for Defendants Mercer County, Mercer County Detention Center, Patrick F. McManimon, and Mamie Sapp.

1. Rodriguez's report is dated April 15, 1997—the date that the alleged incident occurred. However, the report recounts conversations that Rodriguez had with several witnesses throughout the month of April and into May of 1997, therefore, the report could not have been written on April 15. The date on the report likely refers to the date of the incident and the report probably was written some time after May 20, 1997.

**OPINION**

GARRETT E. BROWN, Jr., District Judge.

This matter comes before the Court upon the motion of defendants, Mercer County, Mercer County Detention Center, Warden Patrick McManimon and Captain Mamie Sapp (collectively the "County Defendants"), for summary judgment on the plaintiff's amended complaint. For the reasons set forth in this Memorandum Opinion, the defendants' motion is granted.

## I. BACKGROUND

On August 5, 1997, plaintiff, Lisa Whitaker, filed a complaint alleging, among other things, that on or about April 15, 1997, defendant, Sergeant Louis Soto, sexually assaulted her at the Mercer County Detention Center, where both Whitaker and Soto were employed as corrections officers. *See* Plaintiff's Amended Complaint at ¶¶ 1 and 9; Plaintiff's Statement of Material Facts at ¶ 6. Whitaker alleges that Sergeant Soto approached her from behind while the two were stationed alone in the Receiving and Discharge area of the jail and grabbed her breasts, began fondling them and stated "Oh, they're so soft." *See* Plaintiff's Brief in Opposition to Defendants' Motion for Summary Judgment ("Plaintiff's Brief") at 3. Soto claims that, as a result of a diabetic episode on April 15, 1997, he does not have any recollection of the alleged attack and can neither confirm nor deny Whitaker's description of the assault. *See* Report of Edwin W. Rodriguez dated April 15, 1997 at 6–7, attached to Plaintiff's Opposition as Exhibit i [1]; Defendants' Brief in Support of Motion for Summary Judgment ("Defendants' Brief") at 1.

On or about September 23, 1998, the plaintiff filed an amended complaint in which she further alleged that the County

Defendants had retaliated against her for her having filed this action. *See* Plaintiff's Amended Complaint at Count XIII.

On or about November 10, 1998, the County Defendants moved for summary judgment. The parties appeared before the Court on December 11, 1998 for oral arguments. At those arguments, the Court granted in part and denied in part the defendants' motion. The accompanying order was filed on December 16, 1998. In the December 11, 1998 oral opinion and December 16, 1998 Order, the following counts of plaintiff's amended complaint were dismissed: 1) plaintiff's claims for retaliation contained in Count XIII of the Amended Complaint; 2) the plaintiff's claim for civil conspiracy contained in Count VIII of the Amended Complaint; and 3) the plaintiff's claim under the Violence Against Women's Act, 42 U.S.C. § 13981, *et seq.*, contained in Count IX of the plaintiff's Amended Complaint as to the County Defendants only. The County Defendants' motion for summary judgment as to the plaintiff's claims under the Civil Rights Act, 42 U.S.C. § 1983, *et seq.*, was denied. However, the parties failed to address the issues of employer liability for sexual harassment by supervisors under § 1983 in light of the recent United States Supreme Court opinions in *Faragher v. City of Boca Raton*, 524 U.S. 775, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998) and *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998). This motion followed.[2] Additionally, by letter dated November 3, 1998 from plaintiff's counsel, Mark Mulick, Esquire, the plaintiff informed the Court that she was voluntarily withdrawing her negligence claims against all defendants, which are contained in Counts II, V, VI and VII of the Amended Complaint.

In summary, Count I of the Amended Complaint is not asserted against the County Defendants; the plaintiff has withdrawn Count II as to all defendants; Count III is not asserted against the County Defendants; Count IV of the Amended Complaint was dismissed as to the County Defendants on December 11, 1998;[3] the plaintiff has withdrawn Counts V, VI and VII as to all defendants; Count VIII was dismissed as to all defendants on December 11, 1998; Count IX was dismissed as to the County Defendants only on December 11, 1998; the plaintiff has withdrawn Count X and the allegations of that Count are incorporated into Count XII; Count XIII was dismissed as to the County Defendants. The only remaining claims against the County Defendants are Count XI alleging that the County Defendants violated the New Jersey Law Against Discrimination, N.J. Stat. Ann § 10:5–1, *et seq.*, and Count XII alleging that the County Defendants violated the plaintiff's civil rights in violation of 42 U.S.C. § 1983. The County Defendants now seek dismissal of the two remaining Counts against them.

First, relying on *Faragher* and *Ellerth*, the County Defendants claim they cannot be held liable for Soto's attack on the plaintiff, because the County Defendants had no prior knowledge of any proclivity by Soto to commit a sexual assault. *See*

2. The plaintiff argues that the issues raised by the Supreme Court in *Faragher* and *Ellerth* were previously addressed when the County Defendants' previous motion for summary judgment was denied and that, therefore, the instant motion is nothing more than an untimely motion for reargument brought pursuant to L.Civ.R. 7.1(g). *See* Plaintiff's Opposition at 12–13. While the *Faragher* and *Ellerth* decisions were discussed at the December 11, 1998 hearing, the Court was without the benefit of the parties briefing and factual submissions on the issues raised by those cases. Now that the parties have had an opportunity to brief thoroughly the issues raised by the Supreme Court in those cases and present facts relevant to those opinions, the plaintiff's claims can be analyzed in light of the current state of the law.

3. The dismissal of Count IV's claim of intentional infliction of emotional distress was inadvertently omitted from the December 16, 1998 Order. The dismissal will be reflected in the Order accompanying this Memorandum Opinion.

Defendants' Brief at 4–10. Second, relying on the United States Court of Appeals for the Third Circuit's recent decision in *Hurley v. Atlantic City Police Dep't*, 174 F.3d 95 (3d Cir.1999), the County Defendants argue that under the New Jersey Law Against Discrimination, N.J. Stat. Ann. § 10:5–1, *et seq.*, they cannot be held liable for aiding or abetting Soto's conduct, because the County Defendants did not substantially assist in Soto's allegedly discriminatory conduct. *See* Defendant's Brief at 11–12. Third, the County Defendants claim that 42 U.S.C. § 1983 precludes the award of punitive damages against a governmental entity or a state actor sued in his or her official capacity and that the plaintiff cannot demonstrate that the governmental actors who are sued in their individual capacities acted with evil motive or intent that would subject them to punitive damages. *See* Defendants' Brief at 12–13. Finally, the County Defendants argue that they are not liable for punitive damages under the New Jersey Law Against Discrimination because the plaintiff cannot prove that any of the County Defendants acted with actual malice towards the plaintiff. *See* Defendants' Brief at 14–16.

The plaintiff argues in opposition that the County Defendants knew or should have known of Soto's proclivity to commit a sexual assault based on their knowledge of "approximately fifteen acts of assaultive/bizarre behavior upon both women and men" while employed at the Mercer County Detention Center. *See* Plaintiff's Opposition at 3. The plaintiff claims that the County Defendants' knowledge of these prior incidents and their alleged failure to act upon that knowledge is sufficient to hold the County Defendants liable as aiders and abettors under the New Jersey Law Against Discrimination, and that their knowledge at least raises a triable issue of fact to be decided by the jury. *Id.* at 18–20. The plaintiff further argues that the reasonableness of the County Defendants' actions in light of their knowledge of Soto's prior conduct presents a triable issue regarding the County Defendants' § 1983 liability under the Supreme Court decisions in *Faragher* and *Ellerth*. *Id.* at 21–26. Similarly, the plaintiff argues that the County Defendants' knowledge of Soto's prior conduct and their failure to act on that knowledge rises to the level of willful indifference to the plaintiff's rights and exposes the County Defendants to punitive damages under the New Jersey Law Against Discrimination and the Third Circuit's decision in *Hurley*. *Id.* at 27–28.

In short, the validity of all of the plaintiff's arguments depends on whether the County Defendants' knowledge of Soto's prior conduct was sufficient to put the County Defendants on notice that Soto had a proclivity to commit sexual assault. For the reasons discussed below, the Court finds that Soto's conduct prior to the alleged incident between Soto and the plaintiff cannot as a matter of law have put the County Defendants on notice that Soto might sexually assault a female coworker.

## II. DISCUSSION

### A. *Standard for Summary Judgment*

Summary judgment may be granted only if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56; *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In a summary judgment motion, the non-moving party receives the benefit of all reasonable doubts and any inferences drawn from the underlying facts. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). If the non-moving party bears the burden of proof at trial as to a dispositive issue, Rule 56(e) requires him to go beyond the pleadings and designate specific facts showing that there is a genuine issue for trial. *Celotex*, 477 U.S. at 324, 106 S.Ct. 2548; *Schoch v. First Fidelity Bancorporation*, 912 F.2d 654, 657 (3d Cir.1990). Issues of material fact are genuine only "if the evi-

dence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

Here, the County Defendants argue that there are no genuine issues of material fact in dispute that would preclude the Court from dismissing the plaintiff's claims against them as a matter of law. The plaintiff's argument is based on her claim that Soto's prior conduct, the County Defendant's knowledge of that conduct and their failure to act on that knowledge to protect the plaintiff from sexual assault at the hands of Soto raise genuine issues of material fact for the jury to decide. The plaintiff claims that a jury must determine whether the County Defendants' conduct was reasonable after learning about Soto's behavior. Under Fed.R.Civ.P. 56(e), the plaintiff must go beyond the pleadings and "set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). In response to all of the County Defendants' arguments in support of their motion for summary judgment, the plaintiff has set forth Soto's prior conduct as a disputed material fact that would preclude judgment as a matter of law.

**B.** *Plaintiff's Allegations of Soto's Prior Conduct*

Because the plaintiff's arguments in opposition to the County Defendants' motion are premised on allegations regarding Soto's prior conduct, the plaintiff's claims that Soto demonstrated "assaultive/bizarre" behavior that should have put the County Defendants on notice that he was likely to commit sexual assault must be addressed in turn and considered separately and taken together to determine whether those incidents provided the County Defendants with notice of Soto's proclivity to commit sexual assault.

While the plaintiff refers repeatedly in her opposition papers to fifteen separate incidences of "bizarre" behavior by Sergeant Soto, she specifically discusses only eight in her brief. When questioned at the oral arguments held on July 27, 1999 regarding the number of incidents that she alleges provided the County Defendants with notice of Soto's proclivity for sexual assault, plaintiff's counsel referred the Court to Soto's deposition testimony where he stated that he has suffered approximately fifteen diabetic attacks both on the job and off duty. However, in her opposition papers, the plaintiff has only identified eight specific incidents in support of her claims against the County Defendants. *See* Plaintiff's Opposition at 8–9. Each of the eight alleged incidents will be addressed to determine whether those incidents, separately and taken together, provided the County Defendants with notice of Soto's predisposition to commit sexual assault.

**1.** *The Sergeant Serini Incident*

■ The plaintiff claims that on March 3, 1997, approximately one month before the assault on the plaintiff, Soto touched the breast of another female corrections officer at the Mercer County Detention Center while he suffered a diabetic attack. *See* Plaintiff's Opposition at 8. Specifically, the plaintiff claims:

> On or about March 3, 1997, Sgt. Soto without permission touched the breasts of another [Mercer County Detention Center] employee-Sgt. Maria Serini while on duty. Defendant Capt. Sapp, informally investigated this incident by speaking to Sgt. Serini but no disciplinary action was taken and no incident reports were written until after April 15, 1997. This formal [sic] investigation ended when Sgt. Serini refused to cooperate and told Captain Sapp that she would decide who could touch her breasts and who could not. A more thorough investigation was not conducted until after April 15, 1997. By that time Ofcr. Whitaker has been attacked and indicated to [the Mercer County Detention Center] that she would proceed with criminal and civil action

against Sgt. Soto and [the Mercer County Detention Center].

Plaintiff's Opposition at 8 (citations omitted). The plaintiff's characterization of this incident in her opposition brief leads the reader to conclude that the incident with Sergeant Serini was strikingly similar to the incident with the plaintiff. However, the undisputed facts, the documentary evidence relied on by the plaintiff herself and the sworn testimony of Sergeant Serini belie the plaintiff's characterization and present an entirely different picture.

According to Sergeant Serini, as recounted on or about April 28, 1997, on or about March 3, 1997 she was in the area in which Soto was working at the jail and observed that Soto was agitated. *See* County of Mercer, Department of Public Care and Safety, Division of Corrections, Incident Report dated April 28, 1997 (the "Serini Incident Report") at 1, attached as Exhibit D to Defendants' Brief. The Serini Incident Report goes on to describe the following series of events:

> Lt. Barber stated to me "close the door[,]" Marvin just called and said "Soto is having a diabetic attack [and] he's acting strange [and] could be heard on the elevator.["] I watched Soto come through the first floor security gates [and] he looked very pale and disoriented. He was talking very loud[ly] and was not making any sence [sic]. I came to him and asked is he was o.k. [H]e replied "Hell no[,] I am hungry [and feeling sick.]" I was informed that an ambulance was called, so I than [sic] ordered [Corrections Officer] Lisowski to get Soto something to eat [and] I started to talk to Soto getting him soda [and] candy out of the machine because I went to touch his hands [and] they were very clammy and cold. Medical [department (Nurse Adams)] came down [and] checked his sugar level[,] which was "47" very low so I kept Soto busy and at one time he looked like he was going to pass out. So I went towards him and he went to grab onto me put-

ting his hands on my chest.... At no time did I feel violated when Soto put his hands on my chest that evening.... That particular evening when this happened I did not think of anything other than saving Soto's life [and] not sexual contact.

*Id.* at 2.

Sergeant Serini's sworn deposition testimony similarly describes the March 3, 1997 incident between Serini and Soto, and characterizes the physical contact between her and Soto as incidental contact that occurred while she was administering medical treatment to him during a diabetic seizure—specifically when she initiated contact with Soto out of fear that he was losing consciousness and would injure himself. *See* Serini Deposition at 21–24, attached to Defendants' Brief as Exhibit D. Sergeant Serini again describes the diabetic reaction that Soto suffered on March 3, 1997. *Id.* Serini described the physical contact between her and Soto as follows: "He didn't actually touch me. When I[saw] him sort of like buckling down on his knees, I went to grab him under his arms and his hands was like on top of my shoulders and they stayed there until I sat him down." *Id.* at 41. Plaintiff's counsel then asked Serini if "any part of [Soto's] arms or hands actually touched [Serini's] breasts." *Id.* at 42. Serini replied "Not my breasts directly, I mean no." *Id.*

Contrary to the plaintiff's characterization of the March 3, 1997 incident between Serini and Soto, the physical contact that occurred between them appears to have been nothing more than incidental contact during the course of Serini coming to Soto's aid during a medical emergency. Moreover, there is nothing in the record before the Court that the physical contact between them was ever reported to the County Defendants before the April 28, 1997 Serini Incident Report, which was written almost two weeks after the incident between the plaintiff and Soto and almost two months after Soto's March 3, 1997 diabetic episode. Therefore, even if

the contact between Serini and Soto was something more sinister than the undisputed evidence has shown, the County Defendants were not notified of the contact before the incident between Soto and the plaintiff.

### 2. *The Nurse Adams "Hug"*

■ Plaintiff next points to another incident of physical contact between Soto and two other female coworkers that occurred during his March 3, 1997 diabetic episode. *See* Plaintiff's Opposition at 8. Plaintiff claims that "[d]uring the March 3, 1997 incident, Sgt. Soto also 'hugged' two other female employees of Mercer County Detention Center." *Id.* In support of her allegation that Soto "hugged" two other female employees on March 3, 1997, the plaintiff cites a May 1, 1997 incident report written by Kimberly Adams, R.N, attached to Plaintiff's Opposition as Exhibit N. In that incident report, Ms. Adams states that "Sgt Soto was being assessed for signs and symptoms of hypoglycemia. . . ." Adams Incident Report, Ms. Adams further states that Sergeant Soto hugged her, Serini and Nurse Crosland, and that at the time, Soto "was disoriented and unaware of his act to hug us." Ms. Adams attributed the contact between her and Soto as a result of the hypoglycemic reaction that he was having at the time. *Id.*

Again, the physical contact between Soto and the two nurses that responded to render medical assistance to Soto on March 3, 1997 appears to have been nothing more than incidental contact between a nurse and a patient who was in the throws of a diabetic episode triggered by low blood sugar. Moreover, the Adams incident Report relied on by the plaintiff is dated May 8, 1997—three weeks after the incident between Soto and the plaintiff and more than two months after Soto's March 3, 1997 diabetic episode. There is no evidence before the Court that shows that the County Defendants had notice of the physical contact between Soto and Ms. Adams and Ms. Crosland before the April 15, 1997 assault on the plaintiff.

### 3. *The Heaton/Kidd Incident*

■ Plaintiff also claims that two male corrections officers intervened in a September 29, 1995 incident where Soto assaulted two female officers. *See* Plaintiff's Opposition at 8. In her opposition brief, the plaintiff describes the September 29, 1995 incident as follows:

On September 29, 1995, Officers Toro and Brier [sic][4] were required to intervene when Sgt. Soto assaulted two women officers—Heaton and Kidd[—] during an alleged diabetic incident. The incident was so violent that Officer Brier [sic] was hospitalized. He returned to work the same day with both arms in slings. He missed two[-]and[-]one-half weeks of work.

*Id.*

The September 29, 1995 incident report to which the plaintiff refers states:

On the above date and approximate time I[,] Correction Officer Beers[,] assisted helping nurse Heaton and Officer Toro in Master Control. Officer Soto was having a[n] insulin[ ] attack[.] Officer Soto was kicking and grabbing Officer

---

**4.** Plaintiff's counsel refers to an "Officer Brier" in Plaintiff's Opposition. However the September 29, 1995 incident report on which plaintiff relies and the deposition attached as Exhibit p are by an Officer "Beers." The Court will assume that the officer to which plaintiff refers is Officer Beers. Additionally, Plaintiff's Opposition indicates that the incident with Officer Beers occurred on September 29, 1995. However, the incident report attached to Plaintiff's Opposition is dated September 29 and states that the incident in question occurred on September 27, 1995. Additionally, the Plaintiff's Opposition refers to an exhibit "q" as the Beers incident Report. However, plaintiff's submission does not contain an exhibit "q." Officer Beers's September 29, 1995 incident report is attached to the plaintiff's exhibits after Ms. Whitaker's deposition, Exhibit o, and before Officer Beers's deposition, Exhibit p. The Court also will assume that this September 29, 1995 Beers Incident Report is the document to which plaintiff refers.

Toro and myself[.] At that time[,] Officer Toro and myself restrained Officer Soto so he couldn't bang his head on the floor and that he couldn't hurt himself. Officer Soto had grab[bed] my arm and was squeezing it and swing[ing] it.

Beers Incident Report. In his deposition, Officer Beers described the September 27, 1995 incident not as an assault by Soto on two female employees, but rather as a diabetic episode in which Beers assisted a female nurse and a female corrections officer in administering medical treatment to Soto. Beers described the episode at his deposition as follows:

> I noticed that Soto was in Master Control with a nurse and another officer, and he was jumping up and down in a chair with his eyes in the back of his head, and his head was actually bouncing off the side of a wall.... So, me and Officer Toro ran in there and assisted the nurse. I held him down by his arms and he held on my arm.... I guess when I grabbed him, he grabbed me back as he was going into his fits.... And the nurse was putting, like, sugar to bring him out of, I guess, one of his fits to bring their sugar level up. She just kept putting it in his mouth, putting it in his mouth. About ten minutes later, he came out of it and did not remember anything that happen[ed].

Beers Deposition at 7–8, attached to Plaintiff's Opposition at Exhibit p. Officer Beers then testified that as a result of restraining Soto to prevent Soto from slamming his head into a wall during his diabetic seizure, he tore a muscle in his arm and missed two-and-one-half weeks of work. *Id.* at 8.

Contrary to the plaintiff's characterization of the September 27, 1995 incident between Officer Beers and Officer Soto, Officer Beers did not sustain injury when he "intervene[d] when Sgt. Soto assaulted two women officers." Rather, Beers was injured during the course of assisting a nurse and a female corrections officer in rendering medical treatment to Soto, who,

while in the throws of a diabetic seizure, was slamming his head into a wall. There is no evidence in the record that Soto was "assaulting" female corrections officers on September 27, 1995. Plaintiff's characterization of the evidence regarding this incident is misleading at best. Moreover, there was nothing sexual in nature about the September 27, 1995 incident that would have put the County Defendants on notice that Soto had a predisposition to commit sexual assault. Finally, even if Soto's 1995 seizure could be characterized as an assault on two women, there is no evidence before the Court that would indicate the County Defendants were notified in 1995 that Soto "assaulted" two women employees.

### 4. *The Automated Teller Machine Incident*

 In support of her contention that the County Defendants had notice that Soto was likely to commit a sexual assault on a female coworker, the plaintiff cites an August, 1996 off-duty incident during which Soto prevented customers from using an Automated Teller Machine ("ATM") at a bank. *See* Plaintiff's Opposition at 8. Plaintiff describes the incident at the ATM as follows:

> On or about August 12, 1996, Sgt. Soto took a money machine "hostage" at a local bank. An investigation conducted by [Mercer County Detention Center] Investigator Symanski at the behest of Warden McManimon stated that the bank manager called the Trenton Police Department after Sgt. Soto began acting bizarrely and refused to allow other customers access to a MAC machine. Sgt. Soto, who was armed with a pistol and mace at the time, was arrested by two Trenton Police Officers. Sgt. Soto was released and not charged[,] however[,] following the intervention of [Mercer County Detention Center] authorities. Sgt. Soto was not disciplined following this incident.

■ Accepting plaintiff's characterization of the August 12, 1996 incident as accurate in its entirety, there is nothing sexual in nature about the incident that should have put the County Defendants on notice of Soto's proclivity to commit sexual assault. This incident, no matter how troubling, simply is not material, or even tangentially relevant, to any to any factual claims or legal issues in this case. Evidence of other acts of sexual harassment is probative of whether an employer/defendant knew or should have known that sexually discriminatory behavior was occurring in the workplace. *See Hurley v. Atlantic City Police Dep't,* 174 F.3d 95, 111 (3d Cir.1999) (citing *West v. Philadelphia Elec. Co.,* 45 F.3d 744, 752 (3d Cir. 1995)) (holding that "[e]vidence of other acts of harassment is extremely probative as to whether the harassment was sexually discriminatory and whether [the defendant employer] knew or should have known that sexual harassment was occurring despite the formal existence of an anti-harassment policy."). Evidence of the ATM incident, as with many of the incidents cited by the plaintiff, cannot be characterized as evidence of "other acts of harassment" that provided the County Defendants with notice of ongoing sexual harassment, or notice of Soto's proclivity to commit sexual harassment in the future.

### 5. *Lieutenant McGowan's June 17, 1993 Shift Commander Report*

■ The plaintiff claims that Lieutenant McGowan on June 17, 1993 "described a 'diabetic seizure' by then Ofcr. Soto," and further claims that the Shift Commander Report was "circulated among the highest authorities at the detention center." Plaintiff's Opposition at 8.

In support of her allegation, plaintiff attaches as Exhibit V to her opposition a June 17, 1993 Shift Commander Report that simply states that Soto had a diabetic seizure and was taken to the hospital for treatment. *See* Plaintiff's Opposition at Exhibit V. The report contains absolutely no discussion of Soto's conduct during that seizure. The relevance of the report to the issues raised in the County Defendants' motion is unclear.

In further support of her claims, plaintiff also refers the Court to page twelve of Soto's deposition, which is attached to Plaintiff's Opposition as Exhibit E. Page twelve of Soto's deposition, however, says nothing whatsoever about his June 17, 1993 seizure and nothing about McGowan's Shift Commander Report. The relevance of this passage from Soto's deposition is equally unclear.

In any event, there is no evidence in the June 17, 1993 McGowan Shift Commander Report that would have provided the County Defendants with notice that Soto was predisposed to committing sexual assaults on female coworkers. Like the incident at the ATM, this incident has little, if any, relevance to the issues in this case.

### 6. *Officer Carol Kidd White's Testimony*

Plaintiff claims that Officer Carol Kidd White "testified that she witnessed numerous incidents during which Sgt. Soto 'grabbed' fellow officers prior to April 15, 1997." Plaintiff's Opposition at 8. Plaintiff further claims that "Ms. White herself was grabbed by Louis Soto during one of those incidents." *Id.*

In support of her allegations that Soto grabbed Officer Kidd White, the plaintiff refers to pages 11–16 of White's deposition. In that portion of her testimony, White recounts an incident when, during a diabetic episode, Sergeant Soto grabbed her. *See* White Deposition at 12, attached to Plaintiff's Opposition at Exhibit W. According to White, Soto grabbed her during the diabetic episode and said " 'Oh, honey, please help me,' then 'Oh, baby, I love you.' " *Id.* White claims that she reported this incident in an Incident Report, but was unable to produce or locate a copy of that report. *Id.* at 12–13.

In further support of her allegations regarding Officer White, plaintiff cites an incident report White made on May 15, 1997 in which she states that she observed Soto grab "anyone that was in his range" during periodic diabetic episodes. *See* Plaintiff's Opposition at Exhibit T. This report obviously was not provided to the County Defendants before April 15, 1997 and did not provide the County Defendants with notice of Soto's proclivity to commit sexual assault.

■ First, the May 15, 1997 Incident Report has no relevance to any issues currently before the Court. The issue the Court must address in determining whether the County Defendants are liable under § 1983 and the New Jersey Law Against Discrimination is whether the County Defendants had prior notice of Soto's proclivity to commit sexual assault before his attack of plaintiff. Officer White wrote this incident report one month after Soto's encounter with plaintiff. As to the County Defendants' notice of Soto's prior conduct, the May 15, 1997 Incident Report has no probative value.

■ Officer White's deposition testimony regarding one of Soto's diabetic episodes appears to be more relevant. During that episode, White testified that Soto grabbed her and said "Oh, baby, I love you." White Deposition at 11. Soto's physical contact with White and his statement that he loved her suggests some sort of sexually discriminatory conduct. However, the evidence regarding that incident is insufficient for three reasons. First, White was not able to state when that incident occurred. Second, while White testified that she filed an Incident Report in connection with that incident, neither the plaintiff, nor Officer White has produced a copy of that report. Finally, even assuming that White had prepared a report, the Court cannot determine from White's testimony what information she conveyed to the County Defendants in the report so as to determine what, if anything, the County Defendants knew about the nature of the incident. In any event, the issues raised by White's testimony do not raise any genuine issue of material fact that would preclude judgment as a matter of law. Viewing White's testimony in a light most favorable to the plaintiff, there is nothing in White's testimony that would have placed the County Defendants on notice of Soto's proclivity to commit sexual assault.

### 7. *Soto's Failure to Lock a Gate*

■ Plaintiff claims that "[d]uring an alleged seizure, prior to April 15, 1997[,] Sgt. Soto failed to lock a gate allowing prisoners access to restricted areas and creating a security breach." Plaintiff's Opposition at 9.

· The "security breach" about which Edwin Rodriguez testified has no relevance whatsoever to any issues in this case.

### 8. *The Incident Between Soto and His Mother*

■ Plaintiff claims that after Soto engaged in some unspecified "bizarre/violent behavior ... at his home, Sgt. Soto's mother called [Mercer County Detention Center] Ofcr. Quinones at the detention center seeking help," and that Ofcr. Quinones informed the supervising lieutenant at the time that Sgt. Soto was acting strangely and left work to assist. Plaintiff's Opposition at 9.

In the portion of Soto's deposition testimony to which the plaintiff refers in support of her claim regarding Quinones and Soto's mother, Soto described the following facts surrounding a diabetic seizure:

> [There was] [o]ne episode where I was driving home. I don't remember how I got home, but when my mother came to the house finally, she said that she had called, I had picked up the phone, that I was muttering things over the phone, and she was trying to get me to tell her where I lived so she can come over. I wouldn't answer her so she called my job, where my friend, Officer Quinones,

had went to my mom's house so that my brother and my mother can follow him to my house. They said they were knocking on the door. I was yelling at them, talking to them through the window, but I wouldn't open the door for them. And then they had to call the manager of the building, they had to call the ambulance. And when they came in my house, they said I was down to my underwear, I had a hoagie laying on the floor, I had some candy laying on the floor, I had some donuts laying on the floor, I had all the pillows off the couch laying on the floor, and that's the way they found me.

Soto Deposition at 48–49. Soto testified that he was taken to the hospital by ambulance and later regained consciousness. *Id.* at 49–50. There was no testimony that Soto was violent during this episode or that he sexually assaulted anyone. Additionally, the entirety of Soto's testimony regarding this incident is based on what other people have told him since he has no independent recollection. Id. at 50. The only involvement with the Mercer County Detention Center or its personnel resulted from Soto's mother's telephone call to the detention center to ascertain his apartment number from a friend, who accompanied Soto's mother to the apartment. *Id.* There is no evidence in the record that the incident was reported to the County Defendants. In fact, the only involvement with the County Defendants was Soto's mother's telephone call to his friend, Quinones, who happened to be a Mercer County Detention Center employee. Therefore, this diabetic episode involving Soto's mother has no relevance whatsoever to the issues in this case.

The plaintiff has failed to point to any instance where Soto's conduct either on the job or off duty would have provided the County Defendants with notice the he might commit the type of sexual assault on a coworker that he committed on April 15, 1997. The incidents cited by the plaintiff do not have any sexual overtones, do not

evidence an anti-female animus by Soto, and do not suggest that Soto, by his conduct, had created a sexually discriminatory environment at the Mercer County Detention Center. *See Williams v. General Motors Corp.,* 187 F.3d 553, 565 (6th Cir.1999) (citations omitted)(holding that harassing behavior that is not sexually explicit but is directed at women and motivated by discriminatory animus against women satisfies the " 'based on sex' requirement [of Title VII].''); *see also Andrews v. City of Philadelphia,* 895 F.2d 1469, 1485 (3d Cir. 1990) ("To constitute impermissible discrimination, the offensive conduct is not necessarily required to include sexual overtones in every instance or that each incident be sufficiently severe to detrimentally affect a female employee. 'Intimidation and hostility toward women because they are women can obviously result from conduct other than explicit sexual advances.' ") (quoting *Hall v. Gus Constr. Co.,* 842 F.2d 1010, 1014 (8th Cir.1988)). Plaintiff has failed to cite to the Court one instance where Soto's conduct during a diabetic episode was directed at women in a discriminatory manner evidencing some sex-based animus such that the County Defendants would have notice of Soto's proclivity to commit sexual assault.

C. *Plaintiff's Civil Rights Claims Under 42 U.S.C. § 1983*

██ As a threshold matter, the Court notes that the plaintiff's sexual harassment claims brought pursuant to 42 U.S.C. § 1983 are to be analyzed under the standards developed in similar Title VII litigation brought under 42 U.S.C. § 2000e, *et seq. See Jones v. Clinton,* 990 F.Supp. 657, 668–69 (E.D.Ark.1998) (collecting cases from several jurisdictions applying Title VII standards to sexual harassment claims brought under § 1983); *Behrens v. Rutgers University,* Civ. No. 94–358(JBS), 1996 WL 570989, *5 (D.N.J.1996) (applying Title VII standards to claims brought under §§ 1981 and 1983). Accordingly, the standards announced in recent Supreme Court and Third Circuit decisions inter-

preting Title VII and the County Defendants' liability apply to the plaintiff's remaining § 1983 claim.

The United States Supreme Court recently decided two cases, *Faragher v. City of Boca Raton*, 524 U.S. 775, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998) and *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998), dealing with employer liability in Title VII sexual harassment claims involving discriminatory conduct by supervisors in an effort to resolve the divergent approaches that have been applied among the circuit courts on this issue. *See Faragher*, 118 S.Ct. at 2282 (listing circuit court cases applying varying standards of liability); *Ellerth*, 118 S.Ct. at 2263–64 (noting that "Congress has left it to the courts to determine controlling agency law principles in a new and difficult area of federal law").

 Title VII does not automatically impose liability on employers for the conduct of their employees. *See Faragher*, 118 S.Ct. at 2285 (citing *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 72, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986)); *Kunin v. Sears Roebuck and Co.*, 175 F.3d 289, 293 (3d Cir.1999); *Porchia v. Cohen*, Civ. No. 98–3643, 1999 WL 357352, *5 (E.D.Pa. June 4, 1999). However, "absence of notice to an employer does not necessarily insulate that employer from liability." *Meritor Savings Bank*, 477 U.S. at 72, 106 S.Ct. 2399. When analyzing employer liability for sexual harassment claims, the Court in *Ellerth* stated that "Congress has directed federal courts to interpret Title VII based on agency principles." *Ellerth*, 118 S.Ct. at 2265. The Supreme Court has identified four standards under which an employer can be held liable for the torts committed by its employees according to generally accepted principles of agency law. *Id.* at 2266–2270.

### 1. Scope of Employment

 The "central principle of agency law" is that a master is subject to liability for the torts committed by the servant that are committed while the servant is acting within the scope of his employment. *See Ellerth*, 118 S.Ct. at 2266; *Faragher*, 118 S.Ct. at 2286. As a general rule, a supervisor who sexually harasses a subordinate is not acting within the scope of his employment. *See Ellerth*, 118 S.Ct. at 2267. The Court must determine "'whether or not it is just that the loss resulting from the servant's acts should be considered as one of the normal risks to be borne by the business in which the servant is employed.'" *Faragher*, 118 S.Ct. at 2288 (quoting Restatement (Second) of Agency § 229, Comment a).

 Here, Soto's assaultive conduct on April 15, 1997 was in no way within the scope of his employment. Sexual assault by a corrections officer on another officer cannot be considered one of the risks to be borne by a county corrections facility. Therefore, the County Defendants are not liable for the plaintiff's injuries resulting from that assault under the traditional "scope of employment" rule of agency law.

### 2. Negligence Standard

 "In limited circumstances, agency principles impose liability on employers even where employees commit torts outside the scope of employment." *Ellerth*, 118 S.Ct. at 2267. An employer can also be liable where the employers own negligence is the cause of the harassment. *Id.* "An employer is negligent with respect to sexual harassment if it knew or should have known about the conduct and failed to stop it." *Id.* An employer can be held liable where the employer had knowledge of harassing behavior and did nothing to stop the harassment. *See Faragher*, 118 S.Ct. at 2284. "In such instances the combined knowledge and inaction may be seen as demonstrable negligence, or as the employer's adoption of the offending conduct and its results, quite as if they had been authorized affirmatively as the employer's policy." *Id.* at 2284 It appears from the plaintiff's brief that she is claim-

ing that the Mercer County Defendants knew or should have known that Soto was likely to commit sexual harassment and failed to take steps to prevent it.

As discussed in detail in Part II.B., *supra*, none of the diabetic episodes preceding Soto's assault on the plaintiff reasonably could have put the Mercer County Defendants on notice that Soto had a proclivity to commit a sexual assault. In short, the episodes relied on by the plaintiff were neither sexual in nature nor involved assaults, but, rather were medical emergencies during which Soto made incidental physical contact with both male and female employees who had come to his aid. Moreover, in all of the episodes, Soto was in an unconscious or semiconscious state and could not have formed the requisite intent to commit an assault.

In a recently decided case, the United States Court of Appeals for the Third Circuit addressed the issue of when an employer can be charged with notice of a harasser's conduct where the harasser was a coworker rather than the victim's supervisor. *See Kunin v. Sears Roebuck and Co.*, 175 F.3d 289 (3d Cir.1999). In that case, a male employee of the defendant had been using sexually offensive and intimidating language towards a female coworker at work. *Id.* at 291. At one point, after repeated instances of offensive conduct, the plaintiff in that case approached her supervisor and asked whether cursing was permitted in the workplace. *Id.* The supervisor said no, but the plaintiff failed to take any other action to notify her employer of her coworker's offensive conduct. *Id.* When the plaintiff finally brought the offensive conduct to the attention of management, her supervisor took immediate steps to remedy the situation and protect the plaintiff. *Id.*

The court held in *Kunin* that an employer can only be held liable under Title VII if it had actual or constructive notice of the harasser's conduct and failed to take immediate steps to remedy the conduct. *Id.* at 293–94. In that case, the plaintiff presented evidence at trial that her supervisor was aware generally that the employees in his department used offensive language at work. *Id.* at 295. The Court held, however, that the supervisor's information did not include knowledge that the offensive language was sexual in nature or gender specific. *Id.* Here, while the County Defendants may have had knowledge of Soto diabetic seizures and his attendant unusual behavior, the plaintiff has failed to come forth with any evidence whatsoever that those incidents were sexual in nature. Therefore, the County Defendants never had knowledge that Soto was likely to commit a sexual assault of the nature that he committed against the plaintiff in this case. *Kunin*'s rationale regarding notice is equally applicable here in the supervisory context in that imposing liability on the County Defendants would violate fundamental notions of fairness where the County Defendants never had any information prior to April 15, 1997 that would indicate Soto was inclined to commit the type of blatant sexual assault alleged here.

While the facts of *Kunin* differ from the case at bar in that there had been no repeated assaults or offensive conduct by Soto toward the plaintiff and the alleged harasser in *Kunin* was a coworker as opposed to a supervisor, the principles regarding notice are equally applicable.

### 3. *Apparent Authority Standard*

"[A]pparent authority is relevant where the agent purports to exercise a power which he or she does not have." *Ellerth*, 118 S.Ct. at 2267–68. "In the usual case, a supervisor's harassment involves misuse of actual power, not the false impression of its existence." *Id.* at 2268. Apparent authority analysis, therefore, rarely has application to case of sexual harassment. *Id.*

This case is the usual case. Soto was the plaintiff's supervisor and was not acting with apparent authority.

4. *Aided in the Agency Relation Standard*

The aided in the agency standard requires that the supervisor's position with the employer somehow aided in his sexually harassing behavior. *Id.* To hold an employer liable under the standard, however, requires more than a mere showing that the supervisor was in a position to perpetrate an act of sexual harassment by virtue of his employment. *Id.* The Supreme Court adopted a two-part test to determine whether employers can be held liable for supervisor's harassment in cases where the employer took no tangible job action against a victim of sexual harassment to address this standard's applicability to claims of sexual harassment. *Id.* at 2270. Under the Supreme Court's decisions in *Faragher* and *Ellerth:*

> An employer is subject to vicarious liability to a victimized employee for an actionable hostile environment created by a supervisor with immediate (or successively higher) authority over the employee. When no tangible employment action is taken, a defending employer may raise an affirmative defense to liability or damages, subject to proof by a preponderance of the evidence, *see* Fed. Rule Civ. Proc. 8(c). The defense comprises two necessary elements: (a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise. While proof that an employer had promulgated an anti-harassment policy with complaint procedure is not necessary in every instance as a matter of law, the need for a stated policy suitable to the employment circumstances may appropriately be addressed in any case when litigating the first element of the defense. And while proof that an employee failed to fulfill the corresponding obligation of reasonable care to

> avoid harm is not limited to showing any unreasonable failure to use any complaint procedure provided by the employer, a demonstration of such failure will normally suffice to satisfy the employer's burden under the second element of the defense. No affirmative defense is available, however, when the supervisor's harassment culminates in a tangible employment action, such as discharge, demotion, or undesirable reassignment.

*Ellerth,* 118 S.Ct. at 2270; *Faragher,* 118 S.Ct. at 2292–93.

However, this two-part analysis seems to be inapplicable to cases, like the instant matter, where there has been only one alleged instance of discriminatory behavior against a plaintiff, which the employer took immediate steps to rectify as soon as it was informed. There appears to be no dispute that Mercer County Corrections Facility afforded the plaintiff a complaint procedure through which to report Soto's assault, nor is there any dispute that the plaintiff availed herself of that procedure. As soon as the County Defendants received notice of Soto's assault on the plaintiff, it took immediate steps to investigate and remedy the situation. The plaintiff does not argue that the County Defendants had an inadequate complaint procedure. Rather, she argues that the County Defendants had prior notice of Soto's proclivity to commit a sexual assault and failed to take steps to protect her from him. *See, e.g.,* Amended Complaint at ¶ 61. In this case, because there was only one alleged instance of sexually discriminatory conduct between Soto and the plaintiff, the critical issue is whether the County Defendants had any prior knowledge of Soto's proclivity to commit the sexual assault, and if so, whether they took reasonable steps to protect the plaintiff from him. *See Dees v. Johnson Controls World Services, Inc.,* 168 F.3d 417, 422 (11th Cir. 1999) (noting "in regard to both the direct liability standard and the employer's affirmative defense to vicarious liability, the

employer's notice of the harassment is of paramount importance."). The answer to that question, based on the undisputed facts in the record, simply is no. The diabetic episodes that occurred before April 15, 1997 cited by the plaintiff were medical emergencies, not sexually discriminatory conduct that would have put the County Defendants on notice of Soto's proclivity to commit sexual assault.

The facts of this case are similar to the facts of *Porchia v. Cohen,* Civ. No. 98–3643, 1999 WL 357352 (E.D.Pa. June 4, 1999), where the court granted the plaintiff's employer summary judgment because the employer had no prior notice of sexually discriminatory conduct between the plaintiff and a coworker who raped her. *Id.* at *7. In that case, the plaintiff and her attacker had what appears to be a personal relationship before the rape. *Id.* at *1. The court found that while the employer was aware of the personal relationship between the plaintiff and her attacker, it had no prior knowledge that the relationship had become harassing. *Id.* at *6. The court held that because the employer did not have actual or constructive notice of any untoward activities between the plaintiff and her attacker, the plaintiff could not establish *respondeat superior* liability. *Id.*

Here, while the County Defendants had knowledge of Soto's prior diabetic episodes, they had neither actual nor constructive notice of any sexually discriminatory conduct on the part of Soto, notwithstanding counsel's creative characterizations of those diabetic episodes.

The County Defendants have satisfied their burden under *Celotex* by pointing out the deficiency in the plaintiff's case for employer liability and the plaintiff has failed to come forth with evidence demonstrating a genuine issue of material fact that would preclude judgment as a matter of law on the plaintiff's § 1983 sexual harassment claims.

### D. Plaintiff's New Jersey Law Against Discrimination Claims

As a threshold matter, it should be noted that Count XI of the Amended Complaint asserts a claim for the County Defendants' violation of the New Jersey Law Against Discrimination, but does not state whether the claim is for the County Defendants' own violation of the state law or whether the plaintiff claims that the County Defendants aided and abetted Soto's violation of the law. *See* Plaintiff's Amended Complaint at ¶¶ 58–64. Both theories of liability under the New Jersey Law Against Discrimination will be addressed below.

"The Supreme Court of New Jersey has adopted the methodology governing federal employment discrimination law for state claims of a similar nature." *Marzano v. Computer Science Corp. Inc.,* 91 F.3d 497, 502 (3d Cir.1996) (citing *Clowes v. Terminix Int'l, Inc.,* 109 N.J. 575, 538 A.2d 794, 805 (1988)); *Andersen v. Exxon Co., U.S.A.,* 89 N.J. 483, 446 A.2d 486, 490–91 (1982). Therefore, for the reasons discussed in Parts II.B and II.C., *supra,* the County Defendants are not liable to the plaintiff under the New Jersey Law Against Discrimination.

However, the New Jersey Law Against Discrimination also imposes liability on individuals who aid or abet one who violates the law. *See Failla v. City of Passaic,* 146 F.3d 149, 158–59 (3d Cir. 1998). The law forbids any "person, whether an employer or an employee or not, to aid, abet, incite, compel or coerce the doing of any of the acts forbidden under this act, or attempt to do so." N.J. Stat. Ann. § 10:5–12(e). Employers and individual supervisors can be held liable under the law for aiding and abetting another's sexually discriminatory conduct. *See Hurley,* 174 F.3d at 126. The Court must look to the Restatement (Second) of Torts when applying the aiding and abetting portion of the New Jersey Law Against Discrimination. *See Failla,* 146 F.3d at 158. The Restatement (Second) of

Torts § 876(b) "provides that a person is liable for harm resulting to a third person from the conduct of another when he knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other so to conduct himself." *Hurley,* 174 F.3d at 126 (quoting *Failla,* 146 F.3d at 158 (quoting restatement (Second) of Torts § 876(b))) (internal quotations omitted). The plaintiff can hold the County Defendants liable for aiding or abetting Soto's assault if she can show that the County Defendants inaction rose to the level of rendering "substantial assistance or encouragement" to Soto. *See Hurley,* 174 F.3d at 128 (quoting *Failla,* 146 F.3d at 158, n. 11).

Here, the County Defendants cannot be held liable for aiding and abetting Soto's discriminatory conduct because, as discussed at length above, they did not have prior knowledge that Soto was engaged in sexually discriminatory conduct. Additionally, even if the plaintiff could show that the County Defendants had knowledge of Soto's conduct, the plaintiff has failed to come forward with any evidence that the County Defendants substantially assisted or encouraged Soto's actions.

The County Defendants have satisfied their burden under *Celotex* by pointing out the deficiency in the plaintiff's case for employer liability and the plaintiff has failed to come forth with evidence demonstrating a genuine issue of material fact that would preclude judgment as a matter of law on the plaintiff's claims under the New Jersey Law Against Discrimination.

E. *Plaintiff's Claims for Punitive Damages*

The Court need not address the County Defendants' arguments regarding the plaintiff's claims for punitive damages under § 1983 and the New Jersey law Against Discrimination because the Court is dismissing the counts of the Amended Complaint alleging causes of action under those statutes. The issues raised regarding punitive damages are moot.

## III. CONCLUSION

For the reasons discussed above, the County Defendants' motion for summary judgment is granted. Counts XI and XII of the Amended Complaint are dismissed. An appropriate form of Order is filed herewith.

### ORDER

This matter having come before the Court on the motion of defendants, Mercer County, Mercer County Detention Center, Warden Patrick McManimon and Captain Mamie Sapp for summary judgment; and the Court having considered the submissions of the parties and having heard oral argument on July 27, 1999; and for the reasons set forth in the Memorandum Opinion filed in the above-captioned matter on this date; and for good cause shown;

IT IS this 23rd day of August, 1999;

ORDERED that the motion of defendants Mercer County, Mercer County Detention Center, Warden Patrick McManimon and Captain Mamie Sapp for summary judgment be and hereby is GRANTED. Counts IV, XI and XII of the Amended Complaint are dismissed as to the County Defendants.