**Gayle MANCUSO, Plaintiff,**

v.

**CITY OF ATLANTIC CITY, Defendant.**

**No. CIV.A.00–4157(JEI).**

United States District Court,
D. New Jersey.

April 12, 2002.

Attorneys Hartman, Chartered by Frances A. Hartman, Katherine D. Hartman, Moorestown, NJ, for the Plaintiff.

Jasinski and Paranac, P.C., by Karen M. Williams, Atlantic City, NJ, for the Defendant.

**OPINION**

IRENAS, District Judge.

Presently before the Court is the Motion for Summary Judgment of the Defendant, the City of Atlantic City. In this diversity action, Plaintiff Gayle Mancuso, a former Lieutenant with the Atlantic City Beach Patrol, claims that she was the victim of gender discrimination, sexual harassment and retaliation in violation of the New Jersey Law Against Discrimination, N.J.S.A. 10A:5–1, *et seq.* (the "LAD"). In connection with her claims of sexual harassment, Plaintiff seeks to impose liability upon her employer, the City of Atlantic City, for the injuries she suffered as a result of the actions of one of her supervisors. Because there remain in this case genuine issues of material fact relating to whether the City may be held liable for the harassment to which Plaintiff was allegedly subjected, summary judgment will be denied with regard to Plaintiff's claims of sexual harassment, including her claim for punitive damages. However, because the Defendant has demonstrated that there are no genuine issues of material fact relating to Plaintiff's claim that she was transferred in retaliation for her complaints of sexual harassment, the Court will grant summary judgment on that claim.

I.

In the summer of 1978, Plaintiff Gayle Mancuso became the second female lifeguard hired by the Atlantic City Beach Patrol (hereinafter "ACBP" or "the Beach Patrol"). Until her resignation in July 2000, Plaintiff spent each summer thereafter (with two exceptions while she was pregnant) working for the ACBP, attaining the rank of Lieutenant in 1997. Plaintiff contends, however, that despite her prominent position, she was, throughout her tenure with the Beach Patrol, "subject to discrimination in many forms, including but not limited to being denied facilities and a uniform, having her numerous athletic accomplishments ignored because of her gender, being subject to pornography,

and being ridiculed because of her gender." (Pl. Br. at 1).

In 1980, Plaintiff was assigned to the Montgomery Avenue beach of the ACBP's Bartram Avenue "tent".[1] Plaintiff asserts that it was while working at Bartram Avenue in the late 1980's, under the command of Captain George Sarkis, that she first became the victim of sexual harassment. (Mancuso Dep. I at 25). According to Plaintiff, under Sarkis' command, she was forced, as the only woman then at Bartram Avenue, to use inadequate and inferior changing facilities, was subjected to repeated derogatory comments by Sarkis about her breasts and was asked, by Sarkis, to transfer because he felt "it was somebody else's turn to deal with the women." (*Id.* at 25–26, 55). In response to this treatment, Plaintiff allegedly complained to Sarkis, and to former ACBP Chief Arthur Brown, who responded that such treatment was "part of the job" and that Plaintiff should just ignore it. (*Id.* at 55–57). In addition, after Chief Brown retired, Plaintiff allegedly complained, in May of 1990, to the current Chief of the Beach Patrol, Robert Levy, but was told that if she "would do the job that [she] was supposed to, Sarkis would not be making these requests." (*Id.* at 26–30).

In or around 1995, George Sarkis retired from the ACBP and Joseph Rush took over the Bartram Avenue tent. Plaintiff alleges that it was at this point that the discrimination against her increased in frequency and severity. According to Plaintiff, Rush, in his capacity as supervisor of the Bartram Avenue tent, did not permit female lifeguards to work together, or to supervise rookie lifeguards, because "they don't have the physical strength." (Mancuso Dep. I at 62). Plaintiff also testified that Rush made comments, to her and others, to the effect that there was "something seriously wrong with the lifeguard test" if a woman could pass it, and that Rush prohibited training for athletic events by female lifeguards during the work day, whereas male guards were routinely permitted to do so. (*Id.* at 63–64, 77). Further, Plaintiff alleges that Rush frequently made denigrating comments about female lifeguards, such as referring to them as "crunts", permitted pornographic photographs and videos to be displayed at the Bartram Avenue tent and engaged in generally foul and offensive behavior, such as defecating in open containers throughout the tent. (*Id.* at 64, 83, 85–91; Todd Tracy Dep. at 22–24; Daniel Daley Dep. at 33–35).

With regard to her specific treatment by Joseph Rush, Plaintiff alleges that he, along with Frank Yanni, another Lieutenant at Bartram Avenue, instructed the younger lifeguards at the tent that they did not have to listen to the instructions given by Plaintiff, and told Plaintiff that she was a "token woman" who was promoted because of her family connections and that she was "nothing but a lifeguard getting paid a lieutenant's pay, [who] ha[s] no say in anything." (Mancuso Dep. I, at 98–99, 132–33). In addition, Plaintiff alleges that Rush prohibited her from taking children out on the ocean in her lifeguard boat, disciplining her severely when she did so, despite allowing male lifeguards to engage in the same conduct virtually without repercussion and that Rush, despite knowing of Plaintiff's feelings regarding

---

1. The offices, locker rooms, storage areas and medical facilities of the ACBP are housed in buildings referred to as "tents". (Def. Stmt. of Mat. Facts, ¶ 3, n. 2). It appears from the record that each tent is generally staffed by an assistant or area chief and/or a captain, a lieutenant and several lifeguards. (*See* Gayle Mancuso Dep. I at 141, attached as Ex. A to Cert. of Karen M. Williams). The ACBP guards are assigned to lifeguard "stands", each of which surveys a particular beach area and several of which report to each lifeguard tent. (Def. Stmt. of Mat. Facts, ¶ 3, n. 2).

pornography in the workplace, and of her complaints regarding his behavior in general, confronted Plaintiff with a pornographic magazine because he "wanted to show [her] what real women can do." (*Id.* at 108). Finally, Plaintiff alleges that, as time went on, Rush decreased the size of the women's locker facilities at Bartram Avenue and threatened numerous times to have Plaintiff transferred if she complained about her treatment. (*Id.* at 115, 140).

Throughout the period of Rush's alleged harassment of Plaintiff, the Atlantic City Beach Patrol promulgated an "Operations Manual" which detailed the rules and regulations of the agency. Included in this Manual was a copy of the City of Atlantic City's sexual harassment policy. This policy, which applied to all ACBP employees, stated that "sexual harassment means any verbal, written, visual, or physical acts that are offensive in nature, intimidating, unwelcome, or that could be reasonably taken as objectionable" and that any employee who "legitimately believe[d]" that he or she was the victim of sexual harassment and wished to file a complaint was required to submit that complaint to his or her supervisor, department head or personnel director within fifteen days of the alleged harassment. (*See* Atlantic City Beach Patrol Rules and Regulations and Operations Manual at 4–5, attached as Ex. K to Cert. of Karen M. Williams).

At the start of each beach season, ACBP employees were given a copy of the rules handbook, including the sexual harassment policy, and were asked to read, sign and return the policy. (Mancuso Dep. II, at 54–55). Each lifeguard tent was then given a copy of the rules and regulations, which was maintained by the tent's supervisor-in Plaintiff's case, Joseph Rush. (*Id.* at 62–63). Individual employees of the ACBP were not given personal copies of the sexual harassment policy. (*Id.*) While

Plaintiff concedes that she was aware, at least generally, of the existence of the ACBP policy, she contends that she did not comply with its requirements with regard to most of the incidents of alleged harassment by Joseph Rush because she "ha[d] gone through the chain of command previously and ... didn't get anywhere" and because she "didn't believe that there was a place that you could go to make a complaint to where you weren't going to experience some type of hostility." (Mancuso Dep. II, at 55–56).

Toward the end of the summer of 1999, however, Plaintiff brought her complaints to the attention of two individuals: Atlantic City City Solicitor Mary Siracusa and ACBP Captain Russell Alquist. (Mancuso Dep. I, at 92–93, 136–138, 145–149). During these conversations (two with Siracusa and one with Alquist), Plaintiff allegedly described in detail the harassment to which she was subjected by Joseph Rush. However, according to Plaintiff, despite these complaints, no follow-up action, other than a conversation between Siracusa and Rush regarding Rush's behavior, was taken prior to the start of the 2000 season. (Mancuso Dep. II, at 20).

When Plaintiff returned to Atlantic City for the start of the 2000 beach season, she learned that she had been transferred from Bartram Avenue to the beach at Missouri Avenue. (Mancuso Dep. II, at 15). According to Plaintiff, this transfer was very difficult for her because she had developed a number of lasting friendships with patrons at the Bartram Avenue beach and because the working conditions at Missouri Avenue were far inferior to those at the cleaner, more family-oriented beach at Bartram Avenue. (*See id.* at 29–30). Faced with the prospect of this undesirable reassignment, Plaintiff asked Chief Levy why the decision had been made and was informed that it was because a lieutenant was needed at Missouri Avenue and

because it would "ease the tension between [her] and Joe Rush." (*Id.* at 16).

Soon after she began working at Missouri Avenue, Plaintiff had a series of conversations with those in charge of the ACBP regarding her harassment by Joseph Rush. (*Id.* at 18–24). On July 3, 2000, Plaintiff met with ACBP Area Chief Rod Alloise and voiced her complaints about her treatment at Bartram Avenue. Chief Alloise allegedly expressed surprise at the severity of these problems, stating that although he knew of the problems, he did not realize their seriousness, and assured Plaintiff that her allegations would be "further looked into." (*Id.* at 20). In addition, later that same day, Plaintiff spoke with Robert Levy about her problems with Rush and the ACBP. According to Plaintiff, Levy chastised her for neglecting to go through the proper channels, but informed her that he would look into her claims, would "get [her] back to Bartram Avenue" and that "this will all be taken care of." (*Id.* at 21–23).

Following these conversations, Plaintiff was contacted by Mary Siracusa and another member of the City Solicitor's office, Eileen Lindinger, who informed Plaintiff that an investigation into her complaints had been initiated and that a meeting to discuss her allegations should be scheduled. (*Id.* at 49–50). Upon consultation with her husband, Plaintiff agreed to meet with Lindinger a few days later. (*Id.* at 51). Plaintiff, however, did not attend the meeting, instead resigning from the ACBP on July 10, 2000. Despite Plaintiff's resignation, the investigation of her complaints continued, with Joseph Rush ultimately resigning to avoid facing disciplinary charges and Frank Yanni receiving a thirty-day suspension. (*See* Atlantic City City Solicitor's Report, attached as Ex. O to Williams Cert., at 3).

On July 25, 2000, the City of Atlantic City, through its attorneys, offered to restore Plaintiff to her former position at Bartram Avenue and to transfer both Rush and Yanni. (*See* Karen M. Williams letter of July 25, 2000, Ex. P to Williams Cert.). Plaintiff, however, refused the offered reinstatement and filed the instant action on August 24, 2000, naming the City of Atlantic City and Joseph Rush as defendants. In her Complaint, which was amended on October 2, 2000, Plaintiff included claims for gender discrimination, sexual harassment and unlawful retaliation under the LAD against both Joseph Rush and the City of Atlantic City and for defamation against Joseph Rush.[2] On March 30, 2001, Plaintiff and Joseph Rush stipulated to Rush's dismissal from this action.

On December 14, 2001, the City of Atlantic City filed the instant Motion for Summary Judgment, contending that its promulgation of an effective sexual harassment policy precludes a finding of liability for the alleged harassment by Joseph Rush and that Plaintiff's claim of a retaliatory transfer is without merit.[3]

---

**2.** Although Plaintiff makes reference, in her brief, to the allegedly harassing conduct of George Sarkis and Frank Yanni, her Complaint makes no such references and it appears, therefore, that the only conduct for which Plaintiff seeks to hold the City of Atlantic City vicariously liable is that of Joseph Rush. Accordingly, the Court will limit its analysis to that issue.

**3.** In her Amended Complaint, Plaintiff asserts two separate discrimination claims arising out of her experiences with the ACBP. Plaintiff styles her first claim as one for "gender discrimination" and the second as one for "sexual harassment." Although the claims are not entirely distinct, Plaintiff's first claim appears to be based on alleged discrimination manifested in the policies of the ACBP itself, while her second claim arises from the actions of Joseph Rush. In connection with her first claim, Plaintiff alleges that the Beach Patrol provided female lifeguards with facilities and uniforms that were inferior to those given to their male counterparts, that the

This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332.

## II.

"[S]ummary judgment is proper 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (quoting Fed.R.Civ.P. 56(c)). In deciding a motion for summary judgment, because the role of the court is not "to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial," *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986), the Court must construe the facts and inferences in the light most favorable to the non-moving party. *Pollock v. American Tel. & Tel. Long Lines*, 794 F.2d 860, 864 (3d Cir.1986).

## III.

### A.

 Under the New Jersey Law Against Discrimination, it is unlawful for an employer to discriminate "in compensation or in terms, conditions or privileges of employment" against any individual on the basis of sex. N.J.S.A. 10:5–12(a). In *Lehmann v. Toys 'R' Us, Inc.*, the New Jersey Supreme Court recognized that "sexual harassment is a form of sex discrimination" that violates both federal law and the Law Against Discrimination. 132 N.J. 587, 601, 626 A.2d 445 (1993) (*citing Meritor Sav. Bank v. Vinson*, 477 U.S. 57, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986) and *Erickson v. Marsh & McLennan Co.*, 117 N.J. 539, 569 A.2d 793 (1990)). Applying this general principle, the *Lehmann* court concluded that:

> To state a claim for hostile work environment sexual harassment, a female plaintiff must allege conduct that occurred because of her sex and that a reasonable woman would consider sufficiently severe or pervasive to alter the conditions of employment and create an intimidating, hostile or offensive working environment. For the purposes of establishing and examining a cause of action, the test can be broken down into four prongs: the complained of conduct (1) would not have occurred but for the employee's gender; and it was (2) severe and pervasive enough to make a(3) reasonable woman believe that (4) the conditions of employment are altered and the working environment is hostile or abusive.

132 N.J. at 603–604, 626 A.2d 445.

In arguing that it is entitled to summary judgment on Plaintiff's sexual harassment claim, the City of Atlantic City focuses entirely on the issue of its vicarious liability for the actions of Joseph Rush, apparently conceding, at least for purposes of

ACBP had a policy of recognizing the athletic achievements of male employees while ignoring those of female guards, and that, while male lifeguards were paid for the time they spent training for athletic competitions, female employees did not receive any such compensation. (*See* Am. Compl. at 2–5). Because Defendant does not appear to seek summary judgment on Plaintiff's "discrimination" claim, instead focusing its arguments entirely on the issue of the City's vicarious liability for Rush's conduct, Plaintiff's allegations of disparate treatment by the ACBP will not be addressed in this opinion. In any event, even if Defendant did intend Plaintiff's first claim to be included in the instant motion, summary judgment would clearly be inappropriate, as the policies of which Plaintiff complains were implemented by the ACBP itself, through the actions of its upper management, and Defendant's arguments regarding vicarious liability and the terms of the City's antiharassment policy have little application to such claims.

the instant motion, that the elements recited above are satisfied. Accordingly, the Court need not address any questions relating to the severity or pervasiveness of the harassment alleged or to whether the alleged harassment occurred because of Plaintiff's sex.

 From the time he was assigned to Bartram Avenue in 1995, until Plaintiff's resignation in July 2000, Joseph Rush was Gayle Mancuso's supervisor.[4] Under the LAD, as under federal law, an employer's liability for hostile work environment sexual harassment by its supervisory employees is governed by "agency principles." *Lehmann,* 132 N.J. at 619, 626 A.2d 445 (following *Meritor Savings Bank v. Vinson* ).[5] According to *Lehmann,* the basic articulation of these principles is found in § 219 of the Restatement (Second) of Agency, which provides that,

(1) A master is subject to liability for the torts of his servants committed while acting in the scope of their employment.

(2) A master is not subject to liability for the torts of his servants acting outside the scope of their employment, unless:

 (a) The master intended the conduct or the consequences, or

 (b) The master was negligent or reckless, or

 (c) The conduct violated a non-delegable duty of the master, or

 (d) The servant purported to act or to speak on behalf of the principal and there was reliance upon apparent authority, or he was aided in accomplishing the tort by the existence of the agency relation.

*Restatement (Second) of Agency,* § 219 (1957) (quoted in *Lehmann,* 132 N.J. at 619, 626 A.2d 445). Applying these principles, the *Lehmann* court reached the following conclusions:

An employer whose supervisory employee is acting within the scope of his or her employment will be liable for the supervisor's conduct in creating a hostile work environment. Moreover, even in the more common situation in which the supervisor is acting outside the scope of his or her employment, the employer will be liable in most cases for the supervisor's behavior under the exceptions set forth in § 219(2). For example, if an employer delegates the authority to control the work environment to a supervisor and that supervisor abuses that delegated authority, then vicarious liability under § 219(2)(d) will follow.

*Id.* at 619–620, 626 A.2d 445.[6]

In this case, Defendant's Motion for Summary Judgment is predicated on the ACBP's promulgation of an "explicit policy against sexual harassment." (Def. Br. at 5). According to Defendant, the existence of this "well-publicized" policy, combined with what Defendant describes as Plaintiff's unreasonable failure to take ad-

---

4. Defendant concedes Rush's supervisory status. (*See* Def. Stmt. of Mat. Facts, at ¶ 3; *see also,* Atlantic City Beach Patrol Organizational Chart, attached as Ex. K to Williams Cert.).

5. In *Lehmann,* the court held that "in cases of supervisory sexual harassment, whether the harassment is of the quid pro quo or the hostile work environment type, the employer is directly and strictly liable for all equitable damages and relief." 132 N.J. at 617, 626 A.2d 445. Equitable relief, the court noted,

includes the reinstatement of the harassment victim, the discipline, transfer or firing of the harasser, the implementation of preventative and remedial measures and provision of back and/or front pay. *Id.* Accordingly, to the extent that Defendant seeks summary judgment on Plaintiff's claims for back pay, its motion will be denied.

6. Neither party has raised the issue of whether Rush's harassment occurred within the scope of his employment.

vantage of the preventive or corrective opportunities offered to her by the ACBP, precludes her claims against Atlantic City. (*Id.* at 11). To support this proposition, Defendant relies on the United States Supreme Court's 1998 decisions in *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998) and *Faragher v. City of Boca Raton*, 524 U.S. 775, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998).

The Supreme Court's decisions in *Faragher* and *Ellerth* focused on the application of § 219(2)(d)'s "aided-by-agency relation" standard to sexual harassment claims brought under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e2(a)(1). *See Ellerth*, 524 U.S. at 760–65, 118 S.Ct. 2257; *Faragher*, 524 U.S. at 802–808, 118 S.Ct. 2275; *see also, Durham Life Ins. Co. v. Evans*, 166 F.3d 139, 150 (3d Cir.1999). After recognizing the potentially broad scope of this standard, the Court concluded that "an employer is subject to vicarious liability to a victimized employee for an actionable hostile environment created by a supervisor with immediate (or successively higher) authority over the employee." *Ellerth* at 765, 118 S.Ct. 2257; *Faragher*, at 807, 118 S.Ct. 2275. However, the Court went on to hold that "[w]hen no tangible employment action is taken, a defending employer may raise an affirmative defense to liability or damages, subject to proof by a preponderance of evidence." *Id.* This affirmative defense, the Court held, "comprises two necessary

elements: (a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." *Id.*

Here, both Plaintiff and Defendant argue their cases within the framework established by *Faragher* and *Ellerth*. Atlantic City contends that its promulgation of an antiharassment policy, combined with Plaintiff's failure to file timely complaints regarding Rush's alleged harassment, compel a finding that the requirements of the *Ellerth/Faragher* defense are met and that summary judgment should be granted. Plaintiff counters with an argument that the City's antiharassment policy is inadequate and that, in any event, Plaintiff's failure to invoke the protections of that policy or to "avoid harm otherwise" was not unreasonable. Implicit in these arguments, of course, is that the framework announced by the Supreme Court for application in Title VII cases is equally applicable to cases applying only the New Jersey LAD. This Court, however, does not believe that proposition to be as clear as the parties seem to suggest.

Contrary to the Defendant's assertions, neither the New Jersey Supreme Court, nor the intermediate appellate courts of the state, have expressly incorporated the *Ellerth/Faragher* affirmative defense into the analysis of employer liability issues under the LAD.[7] Accordingly, this

---

7. The cases the Defendant cites to support the proposition that the *Ellerth /Faragher* defense has been explicitly applied to claims under the LAD, *Cavuoti v. New Jersey Transit Corp.*, 161 N.J. 107, 735 A.2d 548 (1999), *Heitzman v. Monmouth County*, 321 N.J.Super. 133, 728 A.2d 297 (App.Div.1999), and *Hurley v. Atlantic City Police Dept.*, 174 F.3d 95 (3d Cir. 1999), do not support that argument. While both *Cavuoti* and *Heitzman* recited the elements of the *Ellerth /Faragher* defense, they did so only to support the general proposition that an employer's vicarious liability under Title VII is, as under the LAD, governed by the agency principles of the Restatement of Agency; neither case applied the *Ellerth/Faragher* defense to its facts, nor indicated that the defense is generally applicable under the LAD. *See Cavuoti*, 161 N.J. at 117 n. 1, 735 A.2d 548; *Heitzman*, 321 N.J.Super. at 145 n. 3, 728 A.2d 297. Further, in *Hurley*, the Third Circuit, in evaluating the appellant's claim that this Court had improperly instructed the

Court's task would generally be "to apply state law as interpreted by the state's highest court in an effort to predict how that court would decide the precise legal issue before [it] [and] [i]n the absence of guidance from the state's highest court, . . . to consider decisions of the state's intermediate appellate courts for assistance in predicting how the state's highest court would rule." *Gares v. Willingboro Township*, 90 F.3d 720, 725 (3d Cir.1996) (citations omitted). However, in this case, the Court need not reach the difficult issue of the New Jersey Supreme Court's likely course with regard to *Ellerth* and *Faragher*, as Defendant's motion must, regardless of the analytical framework applied, be denied with respect to Plaintiff's harassment claims.

■ While it is generally true that "the substantive and procedural standards that [New Jersey courts] have developed under the State LAD have been markedly influenced by the federal experience," *Lehmann*, at 600, 626 A.2d 445; *Grigoletti v. Ortho Pharmaceutical Corp.*, 118 N.J. 89, 96, 570 A.2d 903 (1990), those courts have "applied the Title VII standards with flexibility" and "have not hesitated to depart from federal precedent if a rigid application of its standards is inappropriate under the circumstances." *Id.* In *Lehmann*, the New Jersey Supreme Court stated, with respect to the imposition of employer liability under the aided-by-agency relation standard of § 219(2)(d), that:

> The determination of whether a supervisor who creates a hostile work environment was aided in accomplishing that tort by the power delegated to him or her to control the day-to-day working environment requires a detailed fact-specific analysis. Specifically, the finder of fact must decide:
>
> 1. Did the employer delegate the authority to the supervisor to control the situation of which plaintiff complains?
> 2. Did the supervisor exercise that authority?
> 3. Did the exercise of authority result in a violation of [the LAD]?
> 4. Did the authority delegated by the employer to the supervisor aid the supervisor in injuring the plaintiff?
>
> When the answer to each of these questions is yes, then the employer is vicariously liable for the supervisor's harassment under § 219(2)(d).

132 N.J. at 620, 626 A.2d 445. As this inquiry makes clear, the court in *Lehmann* contemplated that the applicability of the aided-by-agency-relation standard to a plaintiff's claims should be determined through a case-specific examination of the manner in which the authority delegated to a supervisor actually enabled him or her to engage in the harassment at issue.

In adopting the affirmative defense discussed above, however, the U.S. Supreme Court appeared to disavow a case-by-case application of the agency principles of § 219(2)(d) in determining employer liabili-

---

jury on the issue of employer liability under Title VII and the LAD, expressly rejected the argument Defendant makes in this case: "*Faragher* and *Ellerth* do not necessarily control this case, which was also brought under the New Jersey LAD . . . [e]ven if the jury instructions are not quite right with respect to *Faragher*, there is no colorable argument that they misstated New Jersey law." *Hurley*, 174 F.3d at 120. Nor has the Court uncovered

any decision specifically establishing the applicability of *Ellerth* and *Faragher* to LAD claims. *See, e.g., Shepherd v. Hunterdon Developmental Center*, 336 N.J.Super. 395, 765 A.2d 217 (App.Div.2001); *Newsome v. Administrative Office of the Courts of the State of New Jersey*, 103 F.Supp.2d 807, 821–22 (D.N.J.2000); *Whitaker v. Mercer County*, 65 F.Supp.2d 230, 245–46 (D.N.J.1999).

ty issues, concluding that the adoption of a standard of liability that focuses on and requires proof of an affirmative invocation of delegated authority by a harassing supervisor in all cases is likely to lead to inconsistent and unjust results:

> How far from the course of ostensible supervisory behavior would a company officer have to step before his orders would not reasonably be seen as actively using authority? Judgment calls would often be close, the results would often seem disparate even if not demonstrably contradictory.... We think plaintiffs and defendants alike would be poorly served by an active use rule.

*Faragher* at 804, 118 S.Ct. 2275.

As noted, whether the New Jersey courts are likely to respond to the concerns expressed in *Ellerth* and *Faragher* in the same manner as the Supreme Court is an open question. While the conclusion that an employer should, in all cases, be held liable for unlawful tangible employment actions taken by a supervisor is unlikely to yield results that are substantially different from those likely to follow from the test articulated in *Lehmann,* the decision to adopt an affirmative defense to liability in all other cases is necessarily based on the specific policies and objectives of the New Jersey LAD, *cf. · Faragher* at 803 n. 3, 118 S.Ct. 2275 ("[O]ur obligation here is not to make a pronouncement of agency law in general or to transplant § 219(2)(d) into Title VII. Rather, it is to adapt agency concepts to the practical objectives of Title VII."), and it is by no means clear that the New Jersey Supreme Court will reach the same conclu-

sions as did the Court in *Ellerth* and *Faragher.* As the Third Circuit noted in *Hurley v. Atlantic City Police Department,* 174 F.3d 95 (3d Cir.1999), "the LAD is a remedial statute, in some respects broader and more flexible than Title VII ... [t]his is so even though New Jersey often looks to the federal system for interpretive authority." *Id.* at 121 n. 19. Indeed, in *Cavuoti v. New Jersey Transit Corp.,* the New Jersey Supreme Court provided an indication that, even after *Ellerth* and *Faragher,* New Jersey may continue to adhere to the broader, case-by-case agency analysis articulated in *Lehmann,* reiterating that, under the LAD, "an employer is generally liable for a hostile work environment created by a supervisor because the power an employer delegates to a supervisor 'to control the day-to-day working environment' facilitates the harassing conduct." 161 N.J. 107, 117, 735 A.2d 548 (1999) (quoting *Heitzman v. Monmouth County,* 321 N.J.Super. 133, 144–45, 728 A.2d 297 (App.Div.1999) and *Lehmann,* 132 N.J. at 620, 626 A.2d 445).[8]

However, there is also support for the proposition that the New Jersey Supreme Court may be inclined to follow the course charted by the Supreme Court in *Ellerth* and *Faragher.* As the Third Circuit has noted, the New Jersey Supreme Court has "never rejected outright the United States Supreme Court's approach to federal antidiscrimination law" and "has noted that there exists 'an imputed but strong legislative intent to harmonize the State's antidiscrimination statutes with the dominant federal view....'" *McKenna v. Pacific*

---

**8.** One court appears to have concluded, at least implicitly, that the agency analysis articulated in *Lehmann* continues to govern LAD harassment claims, even after *Ellerth* and *Faragher.* In *Newsome v. Administrative Office of the Courts of the State of New Jersey,* the court, despite application of the *Ellerth /Faragher* defense to grant summary judgment on the plaintiff's Title VII claims, held that, under *Lehmann,* the aided-by-agency-relation standard could provide a basis for employer liability as "the reasonableness of the [defendant's] actions in implementing anti-harassment policies is no defense to harassment committed because of the agency relationship." 103 F.Supp.2d at 822.

*Rail Service*, 32 F.3d 820, 830 (3d Cir. 1994) (*quoting Grigoletti*, 118 N.J. at 108, 570 A.2d 903). Further, in *Cavuoti*, the court, despite its seeming affirmance of the aided-by-agency-relation analysis articulated in *Lehmann*, recited the specific elements of the *Ellerth /Faragher* defense and noted that "the Supreme Court of the United States has held ... that an employer's vicarious liability under Title VII ... is also governed by the principles set forth in the Restatement (Second) of Agency." 161 N.J. at 117 n. 1, 735 A.2d 548; *see also, Heitzman*, 321 N.J.Super. at 146 n. 3, 728 A.2d 297. In addition, the court has indicated, both before and after the decisions in *Ellerth* and *Faragher*, a receptiveness to use of an employer's anti-harassment efforts as a basis for avoidance of employer liability in some cases, stating that "like the [U.S.] Supreme Court, we have afforded a form of safe haven for employers who promulgate and support an active, anti-harassment policy," *id.* at 120–121, and that "the effectiveness of an employer's remedial efforts ... is relevant to an employer's affirmative defense that its actions absolve it from all liability," *Payton v. New Jersey Turnpike Auth.*, 148 N.J. 524, 536–37, 691 A.2d 321 (1997).

■ However, as noted, the Court need not reach the issue of the New Jersey Supreme Court's likely reaction to *Ellerth* and *Faragher*. Applying the specific four-factor aided-by-agency-relation test articulated in *Lehmann*, it is clear that the City of Atlantic City may be held liable for Joseph's Rush's conduct. First, there appears to be little question that Joseph Rush was given the power, by the ACBP, to control the working environment at Bartram Avenue. In addition, Plaintiff alleges that Rush used this authority to harass her through, among other things, discriminatory job assignment policies, imposition of selective discipline and instructions to various subordinate ACBP employees that they need not follow the instructions given them by Plaintiff. Harassment through such means requires the explicit exercise of delegated authority and, without question, a factfinder applying the detailed inquiry stated in *Lehmann* could reasonably conclude that such harassment, if it occurred as alleged, was aided by Rush's agency relationship with the ACBP.

Further, there remain in this case substantial issues of material fact relating to Atlantic City's exercise of reasonable care to prevent and correct instances of sexual harassment within its workplace, and to the reasonableness of Plaintiff's efforts to avoid such harassment, such that, even if the *Ellerth /Faragher* affirmative defense did apply to Plaintiff's claims, summary judgment in favor of the City would nonetheless be inappropriate.

The touchstone of the first element of the affirmative defense articulated in *Ellerth* and *Faragher* is the employer's exercise of reasonable care to prevent and correct any sexually harassing behavior in its workplace. As the Supreme Court noted, "while proof that an employer had promulgated an antiharassment policy with complaint procedure is not necessary in every instance as a matter of law, the need for a stated policy suitable to the employment circumstances may appropriately be addressed in any case when litigating the first element of the defense." *Ellerth*, at 765, 118 S.Ct. 2257; *Faragher*, at 807, 118 S.Ct. 2275. In this case, there is little question that, given the work environment at the ACBP, Atlantic City's duty of reasonable care included an obligation to promulgate and disseminate an effective antiharassment policy. Indeed, the workplace at issue in this case appears to be very similar to that involved in *Faragher*, a case also involving a beach patrol. In *Faragher*, the Court held that the affirmative defense articulated in that case was

unavailable to the defendant as a matter of law, as "the City had entirely failed to disseminate its policy against sexual harassment among the beach employees and ... its officials made no attempt to keep track of the conduct of [its] supervisors...." 524 U.S. at 808, 118 S.Ct. 2275. Further, the Court noted that "those responsible for city operations could not reasonably have thought that precautions against hostile environments in any one of many departments in far-flung locations could be effective without communicating some formal policy against harassment, with a sensible complaint procedure." *Id.* at 808–09, 118 S.Ct. 2275.

This Court also notes a further basis for the conclusion that the City could not exercise reasonable care without the promulgation and dissemination of an effective antiharassment policy. In this matter, Plaintiff has provided evidence regarding not only the harassment to which she herself was subjected, but also of a general environment of discrimination and harassment persisting at the ACBP since it first accepted women in its workplace. As this Court noted in *Hurley*,

> [i]t is not unforeseeable that in some work environments certain employees will engage in sexual harassment, and it is even more predictable in a male bastion such as a police department. Indeed, the need for a vigilant and responsive approach to sexual harassment ought to be more obvious to managers in such environments than it might be to managers of more refined or gender-integrated workforces.

933 F.Supp. at 422. Here, Plaintiff has testified to the reluctant acceptance of female lifeguards by many of the male officers with the ACBP and the substandard treatment to which many female guards were subjected. For instance, in addition to her general allegations regarding the male-dominated work environment at the

ACBP, Plaintiff asserts that her faith in the ACBP's commitment to the elimination of sexual harassment was indelibly colored by the treatment of Gay Kelley, the first female lifeguard hired by the ACBP. According to Plaintiff, in the mid 1980's, a number of male lifeguards harassed Kelley by, among other things, painting her lifeguard stand pink and with the term "C1" (for "cunt number one") and urinating on and then freezing her bathing suit. (Mancuso Dep. I at 32). Plaintiff further alleges that when this state of affairs was brought to the attention of ACBP management, it was ignored by the highest ranking ACBP officers and, in the case of Joseph Rush, was given public approval. (*Id.*). Given this apparent history, the Court believes that the ACBP was under a particularly stringent obligation to take affirmative steps to prevent, detect and rectify incidents of sexual harassment in its workplace and that this obligation included a duty to implement formal antiharassment mechanisms and to take all reasonable steps necessary to assure that those mechanisms functioned effectively.

It appears undisputed in this case that, at all times relevant to Plaintiff's claims, the ACBP had in place a formal antiharassment policy. Generally, "where ... there is no evidence that an employer adopted or administered an antiharassment policy in bad faith or that the policy was otherwise defective or dysfunctional, the existence of such a policy militates strongly in favor of a conclusion that the employer exercised reasonable care...." *Swingle v. Henderson,* 142 F.Supp.2d 625, 636 (D.N.J.2001) (*quoting Brown v. Perry,* 184 F.3d 388, 396 (4th Cir.1999)). Here, however, there is substantial evidence which indicates that the ACBP's policy was, in fact, defective and which therefore could support a conclusion that it failed to exercise reasonable care in implementing that policy. In *Lehmann,* the New Jersey

Supreme Court, noting that, under the LAD, while not dispositive, "the existence of effective preventative mechanisms provides some evidence of due care on the part of the employer," discussed the components of an "effective" antiharassment policy:

"Employers that effectively and sincerely put five elements into place are successful at surfacing sexual harassment complaints early, before they escalate. The five elements are: policies, complaint structures, and that includes both formal and informal structures; training, which has to be mandatory for supervisors and managers and needs to be offered for all members of the organization; some effective sensing or monitoring mechanisms, to find out if the policies and complaint structures are trusted; and then, finally, an unequivocal commitment from the top that is not just in words but backed up by consistent practice."

132 N.J. at 621, 626 A.2d 445 (citation omitted). Although the court discussed these considerations in the context of the negligence standard of Restatement § 219, as the Supreme Court noted in *Ellerth*, the aided-by-agency-relation standard is a "more stringent standard of vicarious liability", 524 U.S. at 759, 118 S.Ct. 2257, and, accordingly, the Court believes that the factors articulated above provide an appropriate statement of the relevant considerations that apply to the determination of an employer's exercise of reasonable care under the LAD. Examining these considerations in the context of the specific work environment apparently existing at the ACBP, the Court concludes that there remain substantial issues of material fact relating to Atlantic City's exercise of reasonable care to address sexual harassment on the Beach Patrol and that, accordingly, the elements of the Ellerth/Faragher affirmative defense, even if they were to apply to this case, have not been met.

Once again, the Court begins by noting the similarities between the facts of this case and those in *Faragher.* In *Faragher,* as noted, the Court found, as a matter of law, that the City of Boca Raton had failed to exercise reasonable care to address sexual harassment in its workplace. In reaching this conclusion, the Court noted that the City's "officials made no attempt to keep track of the conduct of [the harassing] supervisors." 524 U.S. at 808, 118 S.Ct. 2275. In this case, the City has offered no evidence of any attempts to monitor the behavior of its employees in the workplace. Given Plaintiff's evidence regarding the work environment at the ACBP and its history regarding the treatment of female lifeguards, such mechanisms would be a critical element of the City's antiharassment efforts and, accordingly, the absence of evidence relating to those efforts counsels strongly in favor of a finding that the Defendant has not carried its burden of demonstrating reasonable care. *Accord Newsome,* 103 F.Supp.2d at 822 (emphasizing lack of evidence relating to defendant's monitoring mechanisms in denying motion for summary judgment under negligence prong of Restatement § 219).

Further, as mentioned, Atlantic City's antiharassment policy sets forth the City's prohibition on sexual harassment, provides a general description of the conduct prohibited by the policy and describes the basic procedure that an employee should follow in order to file a complaint. What the policy does not contain, however, is any sort of assurance that an employee filing a complaint will not be retaliated against for doing so. Such assurances are an important part of any effective sexual harassment policy. The United States Equal Employment Opportunity Commission, a source of authority to which the courts of New Jersey have looked in interpreting the LAD, *see, e.g., Lehmann* at

**804**

623, 626 A.2d 445; *Woods–Pirozzi v. Nabisco Foods,* 290 N.J.Super. 252, 268, 675 A.2d 684 (App.Div.1996), has issued a policy statement regarding the determination, under *Ellerth* and *Faragher,* of the effectiveness of an anti-harassment policy that emphasizes the importance of providing explicit protections against retaliation: "an employer should make clear that it will not tolerate adverse treatment of employees because they report harassment or provide information related to such complaints. *An anti-harassment policy and complaint procedure will not be effective without such assurance.*" *See* EEOC Enforcement Guidance: Vicarious Employer Liability for Unlawful Harassment by Supervisors (6/18/99), EEOC Compliance Manual (BNA), N:4075 [Binder 3], available at http://www.eeoc.gov/docs/harassment.html (emphasis added); *see also,* 29 C.F.R. § 1604.11, Appendix A (2001). This position is supported by the report submitted by Plaintiff's proposed expert, Dr. Michelle Paludi, who suggests that "employees will not typically come forward to file a complaint if they are not assured of protection from retaliation." (Ex. C. to Hartman Cert. at 13). Indeed, this omission may have particular significance in this case, as Plaintiff testified at her deposition that she believed that the City's antiharassment policy "was a document that was meaningless … I signed it but, I didn't believe in it, because I didn't believe that there was a place that you could go to make a complaint to where you then weren't going to experience some type of hostility," and that "the way the Beach Patrol worked was a very intimidating atmosphere … if you made waves, you were punished." (Mancuso Dep. II, at 55; Dep. I, at 57). Given this testimony, a jury hearing and crediting this evidence could reasonably conclude that the absence of assurances of non-retaliation lead ACBP employees, including Plaintiff, to believe that the sexual harassment policy was simply a paper tiger with little or no practical effect and that, accordingly, the ACBP did not exercise reasonable care in the promulgation and administration of that policy.

In addition, under *Lehmann,* an employer's duty of reasonable care generally includes an obligation some sort of training for its employees. Here, while there is evidence that the ACBP did provide some training to its employees, there remain significant questions regarding the efficacy of that training and the answers to those questions could weigh heavily in a jury's consideration of the ACBP's exercise of reasonable care. For instance, while it appears that all full-time City employees, including Joseph Rush, were required, beginning in 1996, to attend sexual harassment training sessions, and while Robert Levy testified that training sessions were provided to all ACBP employees, (Levy Dep. at 93–95), Plaintiff and others contend that they were never provided with any information regarding sexual harassment beyond being required to read and sign the policy contained in the ACBP manual. (*See* Mancuso Dep. II, at 63–64; Tracy Dep. at 64–65). In addition, Levy's testimony reveals that such training was, at the very least, not monitored by the highest-ranking officers of the ACBP and not provided with any sort of regularity. (*See* Levy Dep. 74–76). Further, Defendant has offered no evidence of the substance of the training allegedly provided. The absence of such evidence, the Court concludes, in light of Plaintiff's evidence regarding the work environment existing at the ACBP, provides a further basis for the conclusion that there remain in this case significant questions regarding the sufficiency of the ACBP's antiharassment efforts.

In addition to the elements discussed above, the provision of an expeditious and

flexible complaint structure is, under the LAD, a critical element of an effective sexual harassment policy. *See Payton*, 148 N.J. at 537, 691 A.2d 321 ("[T]he efficacy of an employer's remedial program is highly relevant to both an employee's claim against the employer and the employer's defense to liability."); *Lehmann*, 132 N.J. at 621, 626 A.2d 445. Further, under *Ellerth* and *Faragher*, the complaint processes provided by an employer are relevant to the inquiry into whether the plaintiff unreasonably failed to take advantage of the "preventive or corrective" opportunities provided by the employer. While there is no question that Atlantic City's policy contained an explicit formal complaint procedure, examination of a policy's complaint processes must go beyond the question of the existence of such processes to a consideration of the clarity and detail with which the terms of those processes are communicated to employees and of the ability of employees to invoke that process and rely on its results. Here, there are a number of unresolved issues relating to these questions.

First, it appears undisputed that individual employees were not given their own copies of the City's sexual harassment policy, but that instead each tent was issued a single copy of the Beach Patrols' rules and regulations manual and that this document was kept by the tent's highest-ranking officer. (*See* Def. Stmt. of Mat. Facts at 12–13). Thus, under the ACBP's arrangement, an employee seeking to determine how to file a complaint against her supervisor would, in many cases, be unable to learn how to do so without first asking her supervisor, the alleged harasser, to allow her access to the anti-harassment policy, thereby alerting that supervisor of the employee's complaints and exposing the employee to retaliation. As the EEOC's Enforcement Guidance on *Ellerth* and *Faragher* explains, "[a]n employer's harassment complaint procedure should be designed to encourage victims to come forward. To that end, it should clearly explain the process and ensure that there are no unreasonable obstacles to complaints." *See EEOC Enforcement Guidance* (6/18/99), *supra.* While this case, unlike *Faragher*, does not involve a complete failure of an employer to disseminate its antiharassment policy, the evidence currently before the Court regarding the manner in which the ACBP chose to communicate its policy to its employees is a potentially significant factor in a jury's determination of the Defendant's exercise of reasonable care and of the reasonableness of Plaintiff's reaction to the sexual harassment of which she complains and is, therefore, further support for the conclusion that summary judgment in this case is unwarranted.

In addition, it appears that the ACBP's complaint structure may not have been adequately tailored to the working environment at the Beach Patrol. While the ACBP's sexual harassment policy expressly permits an employee to bring his or her complaints to her department head or personnel director, there is evidence that such recourse may not, in practice, have been available. Specifically, the ACBP rules and regulations state that "the chain of command from the Chief on down in rank and line of authority shall be preserved in order to maintain the principles of good administration. *RANK SHALL NOT BE BY–PASSED.*" (Ex. K, at 1 (emphasis in original)). Further, Russell Alquist testified that Robert Levy believed in the chain of command and, in response to a question regarding whether Levy discouraged employees from complaining to him, that "I don't think you could get to Chief Levy unless you had some kind of friendly relationship with him." (Alquist Dep. at 75–76). What this evidence demonstrates is that while the ACBP's · formal policy provided certain avenues for the filing of

employee complaints, the day-to-day work environment on the Beach Patrol, an environment which the ACBP is obligated to monitor, may have practically precluded some of those avenues. Under such circumstances, a jury could reasonably conclude that Plaintiff was not unreasonable in her failure to complain formally beyond her direct supervisor. *See Faragher* at 808, 118 S.Ct. 2275 ("The record also makes clear that the City's policy did not include any assurance that the harassing supervisors could be bypassed in registering complaints."); *Shaw v. AutoZone, Inc.*, 180 F.3d 806, 812 (7th Cir.1999) (emphasizing that effective antiharassment policy "allows complainant to circumvent the supervisory chain of command.") (internal quotation omitted); *Gares v. Willingboro Township*, 90 F.3d 720, 724, 733 n. 9 (3d Cir.1996) (finding that while the defendant's formal sexual harassment policy permitted employees to complain directly to the township manager, the policy conflict with the "strict 'chain-of-command' procedure" of the township's police department excused the plaintiff's failure to complain beyond her direct supervisor).

Finally, Plaintiff alleges that, during her twenty-three seasons with the Atlantic City Beach Patrol, she observed her employer's response to a number of complaints, both formal and informal, of sexual harassment and that, without exception, these complaints were not taken seriously. This history, she claims, led her to the conclusion that the ACBP's sexual harassment policy was "meaningless." (Mancuso Dep. II, at 55). In connection with this allegation, Plaintiff contends that she attempted to bring her harassment to the attention of a number of ACBP employees who were, under the terms of Atlantic City's sexual harassment policy, charged with a duty to see that her complaints were redressed. Already mentioned are her complaints to George Sarkis, Joseph Rush, former Chief Brown and Robert Levy. In addition to evidence of these complaints, Plaintiff offers testimony that the ACBP ignored several complaints filed by her co-workers. Specifically, Plaintiff alleges that two of her fellow employees at Bartram Avenue, Dan Daley and Sid Cassidy, brought the conditions at Bartram Avenue to the attention of those charged with responding to such complaints, but that no remedial action was taken. (Mancuso Dep. I, at 92; Dep. II, at 24–26). Although these events occurred over several years and involved a number of different individuals, many of the most important players remained constant. That being the case, a jury considering the second prong of the *Ellerth /Faragher* defense could reasonably conclude that Plaintiff's experiences with the ACBP's response to complaints of sexual harassment excused her failure to complain of the specific conduct at issue in this case. *Cf. Cardenas v. Massey*, 269 F.3d 251, 267 (3d Cir.2001) ("In these circumstances, Cardenas' reluctance to file a formal complaint for fear of aggravating the situation or branding himself a troublemaker might not have been unreasonable.").

In conclusion, in *Hurley,* this Court recognized that "what is required [by the LAD] is 'an unequivocal commitment from the top that [the employer's opposition to sexual harassment] is not just in words but backed up by consistent practice." 933 F.Supp. 396, 418 (D.N.J.1996) (quoting *Lehmann* ). Applying this general standard in light of the record currently before it, the Court concludes that Plaintiff has offered sufficient evidence to demonstrate that, given the nature and history of the work environment at the Atlantic City Beach Patrol, there are genuine issues of material fact which, viewed in the light most favorable to Plaintiff, could lead a finder of fact to reasonably conclude that the City of Atlantic City did not exercise reasonable care to prevent and correct

sexual harassment in its workplace or that Plaintiff did not unreasonably neglect to avail herself of the remedial opportunities provided to her by the City and that even if the *Ellerth/Faragher* affirmative defense were available under the New Jersey Law Against Discrimination, it would not provide a basis for summary judgment in this case.[9] Accordingly, for the reasons stated above, because there are disputed issues of material fact from which a jury could reasonably conclude that the City of Atlantic City should be held liable, pursuant to "agency principles", for the conduct of Joseph Rush, Defendant's motion for summary judgment will be denied as to Plaintiff's claims for compensatory damages resulting from the harassment to which she was allegedly subjected.

## IV.

Defendant also seeks summary judgment on Plaintiff's claim for punitive damages against the City of Atlantic City. (*See* Def. Br. at 15). Under the New Jersey Law Against Discrimination, as under Title VII, "the imposition of vicarious liability for punitive damages based on the misconduct of employees requires a distinct method of analysis." *Cavuoti v. New Jersey Transit Corp.*, 161 N.J. at 120, 735 A.2d 548 (*citing Kolstad v. American Dental Association*, 527 U.S. 526, 119 S.Ct. 2118, 144 L.Ed.2d 494 (1999)). In this area, as in those areas discussed above, *Lehmann* is the seminal New Jersey case.

■ In *Lehmann*, the court established "two conditions that must be met as prerequisites to the award of punitive damages in a discrimination suit under [the New Jersey LAD]." *Cavuoti*, 161 N.J.

at 112, 735 A.2d 548; *Rendine v. Pantzer*, 141 N.J. 292, 313, 661 A.2d 1202 (1995). Those conditions are: 1) "actual participation in or willful indifference to the wrongful conduct on the part of upper management"; and 2) "proof that the offending conduct is especially egregious." *Cavuoti*, at 112, 735 A.2d 548 (*quoting Lehmann* at 625, 626 A.2d 445); *Rendine*, at 314, 661 A.2d 1202 (same). Initially, it should be noted that Atlantic City does not challenge the egregiousness of the underlying harassment alleged by Plaintiff. Accordingly, the only question to be decided in connection with the instant motion is whether the City has demonstrated the absence of issues of material fact relating to the actual participation in or willful indifference to the alleged harassment by members of the upper management of the City of Atlantic City. For the reasons stated below, the Court holds that it has not.

■ Plaintiff offers two relatively distinct justifications for the imposition of liability for punitive damages upon the City of Atlantic City. The first is that Chief Robert Levy was willfully indifferent to the behavior of Plaintiff's alleged harassers. (*See* Pl. Br. at 16). Plaintiff's second proposed basis for liability is her contention that Joseph Rush was himself a member of the Defendant's upper management team. (*Id.* at 15–16). Although Plaintiff has offered little evidence regarding her first asserted basis for liability, the Court need not decide that issue at the present time as the evidence relating to Joseph Rush's status as an upper management employee compels denial of Defendant's motion.

9. In addition, based on the considerations discussed above, because "a plaintiff may show that an employer was negligent by its failure to have in a place well-publicized and enforced anti-harassment policies, effective formal and informal complaint structures, training, and/or monitoring mechanisms," *Lehmann*, at 621, 626 A.2d 445, the negligence standard of § 219(2)(b) of the Restatement of Agency also provides a basis for the denial of Defendant's motion in this case.

In *Cavuoti*, the New Jersey Supreme Court formulated the standards for determining whether a wrongdoer is a member of the "upper management" of a defendant employer. After noting that the "the purpose of the definition of upper management is to provide employers with the incentive not only to provide voluntary compliance programs but also to insist on the effective enforcement of their programs," the court concluded that:

> it is fair and reasonable to conclude that upper management would consist of those responsible to formulate the organization's anti-discrimination policies, provide compliance programs and insist on performance (its governing body, its executive officers), and those to whom the organization has delegated the responsibility to execute its policies in the workplace, who set the atmosphere or control the day-to-day operations of the unit (such as heads of departments, regional managers, or compliance officers).

161 N.J. at 128–129, 735 A.2d 548. As this applies to someone, such as Joseph Rush, who is "on the second tier of management," the court held that such a person is a member of upper management if he or she possesses either: "(1) broad supervisory powers over the involved employees, including the power to hire, fire, promote and discipline; or (2) the delegated responsibility to execute the employer's policies to ensure a safe, productive and discrimination-free workplace." *Id.* at 129, 735 A.2d 548. While there appears to be no question that Joseph Rush, even in his capacity as Assistant Chief of the Beach Patrol, did not possess the power to "hire, fire, promote and discipline" ACBP employees, (*see* ACBP Operations Manual, Ex. K to Williams Cert. at 5–7), the evidence here is sufficient to create an issue of material fact relating to whether Rush was delegated responsibility "to execute the employer's policies to ensure a safe, productive and discrimination-free workplace" such that he should be considered a member of the upper management of the City of Atlantic City.[10]

In 1985, Joseph Rush became Assistant Chief of the Atlantic City Beach Patrol. (Rush Dep. at 8). In this position, he was second in command to Roberty Levy, the Superintendent and Chief of the ACBP, who was, in turn, responsible only to the City Administrator and the Mayor. (*See* Atlantic City Beach Patrol Organizational Chart, Ex. L to Williams Cert.). Further, Rush was, at all times relevant to this case, the Captain of the tent at Bartram Avenue. (*See id.;* Rush Dep. at 177).

Pursuant to the Rules and Regulations of the Atlantic City Beach Patrol, Joseph Rush, as Captain at Bartram Avenue, was charged with responsibility for "the discipline, conduct, efficiency and operation" of the tent at Bartram Avenue and to "enforce all departmental rules, regulations and policies" of the ACBP, including the sexual harassment policy. (*See id.* at 7). In addition, in his capacity as Assistant Chief of the Beach Patrol, Rush was responsible to aid the Chief in his duties (such as establishing rules and regulations for the Beach Patrol), to report to the Chief all rules violations and to "instruct all subordinates in their duties." (*Id.*). Thus, it appears that Rush was one of only two individuals to whom the ACBP formal-

---

**10.** The possibility that Joseph Rush could be found to have been an upper management official also provides a further basis for the denial of Defendant's motion with regard to Plaintiff's claims for compensatory damages. *See Lehmann* at 622, 626 A.2d 445 (employer liability is appropriate where upper management knew or should have known of harassment); *Ellerth* at 758, 118 S.Ct. 2257 (employer liability appropriate under Restatement § 219(a) "where the agent's high rank in the company makes him the employer's alter ego"); *Durham,* 166 F.3d at 152 n. 7.

ly delegated the responsibility to train employees in the rules and regulations of their employment and to make sure that those policies were understood and enforced. Further, even if these policies were implemented differently in practice than on paper, it is the position of the ACBP that where sexual harassment training was offered to lower-level employees, it was provided on location at each tent and it was the highest-ranking officer at each tent who was responsible for providing that training, monitoring compliance with the terms of the policy and assuring that the policy was enforced. (*See* Levy Dep. at 74–76).

In defending the terms of its sexual harassment policy and the manner in which it was applied on the beaches of Atlantic City, the City contends that it implemented a flexible policy tailored to the particular work environment found at the Beach Patrol. The informality of this policy, the City appears to argue, was necessitated by the decentralized nature of the ACBP's operations. While such arguments may indeed be relevant to the City's

claims that it exercised due care in formulating and administering its sexual harassment policy, those arguments, and the evidence that supports them, raise questions regarding the nature of the authority delegated under the policy to those in charge of the various lifeguard tents used by the ACBP. Thus, while Joseph Rush did not formulate the ACBP's sexual harassment policy, it appears, based on the record presently before the Court, that a reasonable jury could find that he was charged, either formally or in practice, with the primary responsibility to execute that policy and that he was therefore part of the City's upper management.[11] Accordingly, Defendant's motion will be denied.

## V.

▮ In addition to her claims of sexual harassment and gender discrimination, Plaintiff contends that her transfer to Missouri Avenue prior to the 2000 season was taken in retaliation for her complaints regarding Joseph Rush. (Am. Compl. at 10–14). To state a claim under the LAD's retaliation provision, N.J.S.A. 10:5–12(d), a

---

11. In *Gares v. Willingboro Township, supra,* a decision cited with approval in *Cavuoti,* the Third Circuit determined, on facts similar to those in this case, that an individual in a position comparable to that of Joseph Rush could be found to be a member of upper management. In *Gares,* the plaintiff, Margaret Gares, was a Lieutenant of School Traffic in the Services Division of the Willingboro Police Department. 90 F.3d at 723. While working in that position, Gares was under the direct supervision of Gary Owens, the Captain of the Services Division. *Id.* For seven years, until his promotion to Chief of Police, Owens harassed Gares. In its decision, the Third Circuit held that Owens, in his captain's position, could have been found to have been a member of upper management of the Township:

> For the first seven years of Owens' harassment of Gares (from 1983 to 1990), Owens was the Captain of the Services Division wherein plaintiff Gares worked, answerable

only to the Chief of Police and the Township Manager above him. As Captain of the Services Division, Owens set the atmosphere and controlled the day-to-day operations of that office. Because of his high rank and pervasive influence over the employees he supervised, the jury was entitled to find that Captain Owens was an upper management official . . .

90 F.3d at 733. In the instant case, Joseph Rush, as Assistant Chief of the ACBP was, as mentioned, answerable only to the Chief of the Beach Patrol and the City Manager and Mayor above him. Given such an organizational structure, a jury could, depending on the evidence adduced at trial, reasonably conclude, as it could in *Gares,* that the authority delegated to Joseph Rush permitted him to exercise a pervasive influence over the day-to-day operations at Bartram Avenue and that this, combined with his high rank in the ACBP hierarchy, made him part of the upper management of the City of Atlantic City.

plaintiff must show that: (1) she engaged in a protected activity known to the employer; (2) the employer took an adverse employment action after or contemporaneous with the employee's protected activity; and (3) a causal link exists between the protected activity and the adverse employment action. *See Craig v. Suburban Cablevision, Inc.*, 140 N.J. 623, 629–630, 660 A.2d 505 (1995); *Woods–Pirozzi v. Nabisco Foods*, 290 N.J.Super. at 252, 675 A.2d 684; *Romano v. Brown & Williamson Tobacco*, 284 N.J.Super. 543, 548–49, 665 A.2d 1139 (App.Div.1995); *see also, Abramson v. William Paterson College of New Jersey*, 260 F.3d 265, 286 (3d Cir. 2001) (noting that prima facie case is the same under Title VII and the LAD but that New Jersey courts make the employer's knowledge of the plaintiff's complaints an explicit element).

 Here, neither party disputes that Plaintiff engaged in a protected activity when she complained, in the fall of 1999, to Mary Siracusa and Russell Alquist about the conduct of Joseph Rush and Frank Yanni. Instead, Defendant contends that because it was Robert Levy who alone made the decision to transfer Plaintiff to Missouri Avenue and because Levy was unaware of Plaintiff's complaints at the time he reassigned her, (Def. Br. at 20), Plaintiff has not satisfied the first required element of her prima facie case. Defendant also asserts that, even if it is found that Levy knew of Plaintiff's 1999 complaints, her transfer to Missouri Avenue did not constitute an adverse employment action, as her responsibilities, salary and benefits remained identical at her new location. (Id. at 8).

In her brief, Plaintiff focuses entirely on demonstrating that her transfer to Missouri Avenue constitutes an adverse employment action. However, even if Plaintiff were to succeed in that effort, she has not offered any evidence to support a conclusion that Chief Levy was aware of her complaints at the time he decided to transfer her, nor has she provided any evidence that would permit a jury to conclude that the City's asserted justification for its action is merely pretext for impermissible retaliation. Therefore, the Court agrees with Defendant that summary judgment should be granted.

"The central element of a [retaliation] claim under the LAD is that the plaintiff 'be engaged in a protected activity, which is known by the alleged retaliator.'" *Erickson v. Marsh & McLennan Co., Inc.*, 117 N.J. 539, 560, 569 A.2d 793 (1990). Here, Plaintiff has offered no evidence that would support a conclusion that her complaints ever made their way to Chief Levy. Plaintiff admits that, prior to July 3, 2000, she never complained, orally or in writing, to Chief Levy regarding her harassment by Joseph Rush and that, prior to her transfer, her only complaints were to Mary Siracusa and Russell Alquist. (Mancuso Dep. II, at 61). Further, according to Russell Alquist, he never brought Plaintiff's complaints to the attention of Chief Levy, instead opting to speak to Assistant Chief Alloise, (*see* Alquist Dep. at 63–64), and Plaintiff has not provided any evidence indicating that Alloise, Siracusa, or anyone else ever informed Levy of her complaints. Further, it should be noted that there is no evidence to support Plaintiff's apparent contention that Joseph Rush had a hand in the decision to carry out her transfer. (*See* Rush Dep. at 179–80; Levy Dep. at 109–110).

Plaintiff's only apparent attempt to demonstrate that Levy had knowledge of her 1999 complaints is her citation to Levy's alleged statement that Plaintiff was being transferred, in part, to "alleviate the stress between [her] and Joe Rush." (*See* Pl. Br. at 21). However, this statement demonstrates only that Levy had knowledge of

the tension between Rush and Plaintiff, not that he was aware of her later complaints, as required by the LAD.

Further, even if the Court were to conclude that Plaintiff has raised a triable question regarding Levy's knowledge of protected conduct, summary judgment would still be appropriate as the evidence Plaintiff has provided is insufficient to overcome the legitimate, non-retaliatory justification for the decision offered by the City.

■■■■ Analysis of LAD retaliation claims follows the now-familiar burden-shifting framework established for disparate treatment claims under Title VII and the LAD. *See Shepherd*, 336 N.J.Super. at 418–419, 765 A.2d 217; *Delli Santi v. CNA Insurance Companies*, 88 F.3d 192, 199 (3d Cir. 1996) (citing *Jamison v. Rockaway Township Bd. of Educ.*, 242 N.J.Super. 436, 577 A.2d 177 (App.Div.1990); *Ferraro v. Bell Atlantic Co., Inc.*, 2 F.Supp.2d 577 (D.N.J. 1998) (noting that the burden-shifting approach of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), applies to retaliation claims under the LAD)). Thus, once a plaintiff establishes a prima facie case of retaliation, the burden of production shifts to the employer to articulate a legitimate, non-retaliatory reason for the adverse action taken. *See Fuentes v. Perskie*, 32 F.3d 759, 762 (3d Cir.1994) (citation omitted).

■■■■ In this case, Defendant's asserted justification for Plaintiff's transfer is simple. Prior to the 2000 season, Dave van Winkle, the lieutenant previously stationed at Missouri Avenue, retired. Therefore, because of the staffing policies mentioned at the outset of this opinion, *supra* n. 1, a lieutenant was needed at that station. At the time, Bartram Avenue was the only ACBP tent with two lieutenants and, of the two lieutenants at Bartram Avenue, Plaintiff had the least seniority. Accordingly,

Plaintiff was the most appropriate candidate for the transfer to Missouri Avenue. Further, according to Robert Levy, given Plaintiff's additional responsibilities (as a CPR instructor and supervisor of junior lifeguards), her transfer carried the added benefit of moving Plaintiff to a more central location on the beach. (*See* Levy Dep. at 194). This articulated reason is clearly sufficient to satisfy the Defendant's burden of production and, accordingly, the burden returns to Plaintiff to demonstrate that this justification was merely "a pretext for the retaliation or that a discriminatory reason more likely motivated the employer." *Jamison v. Rockaway Township Bd. of Educ.*, 242 N.J.Super. at 445, 577 A.2d 177; *Delli Santi*, 88 F.3d at 210 n. 6. This she has not done.

"To defeat summary judgment when the defendant answers plaintiff's prima facie case with legitimate, non-discriminatory reasons for its action, the plaintiff must point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Fuentes*, 32 F.3d at 764. While, as noted above, Plaintiff does not offer any specific arguments or evidence to demonstrate a causal connection between her complaints and the decision to transfer her, she appears to rely primarily on the temporal proximity of those two events, along with Levy's knowledge of her subject attachment to remaining at Bartram Avenue, to establish that a retaliatory motive was more likely than not behind her transfer. This evidence, however, is insufficient to do so. While the timing of an adverse employment action is of course an important consideration in evaluating a plaintiff's retaliation claim, "the mere fact that adverse employment action occurs af-

ter a complaint will ordinarily be insufficient to satisfy the plaintiff's burden of demonstrating a causal link between two events." *Krouse v. American Sterilizer Co.,* 126 F.3d 494, 503 (3d Cir.1997) (*quoting Robinson v. City of Pittsburgh,* 120 F.3d 1286, 1302 (3d Cir.1997)). In this case, even if the timing of Plaintiff's transfer, along with the other evidence to which she alludes, is sufficient to establish the causation element of her prima facie case, that evidence simply cannot overcome the City's asserted justification. The record makes it clear that, prior to the 2000 season, Robert Levy was obligated to make a decision transferring an ACBP lieutenant to Missouri Avenue and that because of the manner in which the various tents were staffed at that time, it was Plaintiff who was in line for this reassignment. While it may be true that the transfer was particularly difficult for Plaintiff (although, if Plaintiff's testimony about Missouri Avenue is believed, the transfer would have been resented by anyone receiving it), the evidence she offers simply does not support her contention that it was undertaken for any reason related to her complaints about Joseph Rush.

Plaintiff also asserts, in an apparent attempt to "demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies or contradictions in the employer's reasons for its action that a reasonable factfinder could rationally find them 'unworthy of credence' and hence infer 'that the employer did not act for the asserted non-discriminatory reasons,'" *Fuentes* at 765 (citations omitted), that she was not given any lieutenant's responsibilities at Missouri Avenue. However, there is no evidence to support this contention and, indeed, Plaintiff's conclusory statements in this regard are undermined by the fact that she spent only one week in her new position before resigning. Accordingly, it must be concluded that Plaintiff has not met her burden of demonstrating that the

ACBP's asserted justification for its decision to transfer Plaintiff to Missouri Avenue was motivated not by the staffing considerations it has emphasized, but rather by an intention to punish Plaintiff for her complaints of sexual harassment.

Based on considerations discussed above, therefore, Defendant's motion will be granted with regard to Plaintiff's claim of retaliation.

## VI.

In conclusion, based on the foregoing, Defendant's motion for summary judgment will be denied with respect to Plaintiff's claims of sexual harassment, including her claims for punitive damages relating thereto. However, Defendant's motion will be granted with regard to Plaintiff's claim of retaliation.

## ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

This matter having appeared before the Court upon Defendant's Motion for Summary Judgment, the Court having considered the submissions of the parties, for the reasons set forth in an opinion issued by this Court, which findings of fact and conclusions of law are incorporated herein by reference, and for good cause shown,

**IT IS** on this *12th* day of April, 2002,

**ORDERED THAT:**

1. Defendant's Motion for Summary Judgment on Plaintiff's claims of sexual harassment under the New Jersey Law Against Discrimination, N.J.S.A. 10A:5–1, *et seq.,* including her claim for punitive damages relating thereto, contained in Counts One and Two of Plaintiff's Amended Complaint, is **DENIED**; and

2. Defendant's Motion for Summary Judgment on Plaintiff's claim of retaliation

under the New Jersey Law Against Discrimination, N.J.S.A. 10A:5–1, *et seq.*, contained in Count Three of Plaintiff's Amended Complaint, is **GRANTED**.